George BUNCH, et al.,
Plaintiffs-Appellees,

v.

Donald HODEL, Defendant,

Gary T. Myers, Executive Director of the Tennessee Wildlife Resources Agency, Larry E. Nunn, John D. Graham, Les Hill, Johnny Bellis, Jim Carmichel, Norma Crow, Charles A. Howell, III, Tommy Knowles, Frank Madlinger and Charles Peavyhouse, Commissioners of the Tennessee Wildlife Resources Agency, Defendants-Appellants.

No. 85–5702.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 6, 1986.

Decided June 17, 1986.

W.J. Michael Cody, Atty. Gen., of Tenn., Nashville, Tenn., Michael D. Pearigen, Mary E. Walker (argued), for defendants-appellants.

Alf Adams (argued), Nashville, Tenn., Edward Hall, Brentwood, Tenn., C. Kinian Cosner, Jr., Nashville, Tenn., for plaintiffs-appellees.

Before: MARTIN and KRUPANSKY, Circuit Judges; and CHURCHILL,* District Judge.

BOYCE F. MARTIN, JR., Circuit Judge.

Landowners, business owners, guides and others on Reelfoot Lake, Tennessee, brought this action to enjoin the United States Department of the Interior, Fish and Wildlife Service and the Tennessee Wildlife Resources Agency from proceeding further with a controversial drawdown of water 5.8 feet below the normal pool level of Reelfoot Lake. The drawdown would expose fifty percent of the lake's bed to the drying action of sun and wind for a few months. The drawdown was conceived by Tennessee Wildlife to combat the problems of depleted oxygen levels and reduced sport fish spawning habitat. Although Tennessee Wildlife was the agency actually conducting the drawdown, the plaintiffs claim that the drawdown is a major federal action and thus requires an environmental impact statement under the National Environmental Policy Act, 42 U.S.C. §§ 4321–4361. Upon the entry of a preliminary injunction halting the drawdown, only the director and commissioners of Tennessee Wildlife appeal the order.

The beauty of Reelfoot Lake is a natural resource unparalleled in its region. The environment of the lake is more like that of the bayou than of Western Tennessee. Formed by the New Madrid Earthquakes of 1811 and 1812 and the flow of the Mississippi River, Reelfoot Lake covers approximately 15,500 acres, including approximately 13,000 acres of open water. The State of Tennessee owns approximately 24,-339 acres in and around the Lake. In 1941, Tennessee leased 7,860 acres of its total acreage to the United States Fish and Wildlife Service for 75 years in order to carry out the provisions of the Migratory Bird Conservation Act, 16 U.S.C. §§ 715–715s. The leased land, along with 2,300 adjacent acres in Kentucky owned by the Service, has been consistently maintained by the Service as the Reelfoot National Wildlife Refuge. The leased property includes the spillway and the gates which control the water level of Reelfoot Lake.

The lease specifically reserves "to the State of Tennessee for the benefit of its residents, the right to fish with hook and line" and reserves "to the State of Tennessee the right to prescribe and collect such fees for public hunting and fishing thereon as it may deem appropriate." Concerning the water level of Reelfoot Lake, the lease states:

4. That the Service, in operating and maintaining the dam located at the mouth end of Reelfoot Lake for the purpose of impounding and retaining on the property described in paragraph (b) above such water as may flow naturally on to said lands or may be flowed thereon by the Service, shall not at any time raise artificially the water level in any pool or reservoir created on said Lake more than Three (3) feet above the present spillway level or lower artificially the water level more than Three (3) feet below the present spillway level: Provided. That the Service may temporarily drain a sufficient part of the water found or impounded on all of the areas described herein for the purpose of cleaning and removing or destroying obnoxious plant or animal life growing in said Lake, with the written permission of the Commissioner of Conservation of the State of Tennessee, or his successors, approved by the Governor of Tennessee, *Provided further*, that during no season of the year may the waters of the Lake be entirely drained.

5. That the Service shall maintain and operate, during the term of this lease, the dams and spillways, together with any other appurtenant structures that may be reconstructed or constructed at or near the present location of the dams and spillways located at the south end of Reelfoot Lake.

---

* Honorable James P. Churchill, United States District Judge for the Eastern District of Michigan, sitting by designation.

Widely known for its bird population, hunting, fishing, and as a major wintering area for migratory waterfowl, as well as winter home to a resurging eagle population, Reelfoot Lake currently experiences major inorganic and organic siltation problems. The lake's waters are hypereutrophic, or overly rich in nutrients, which causes a massive amount of plant growth in the fairly shallow water. Large amounts of oxygen are consumed both by the growth of these plants and by their decomposition as they die and settle to the bottom of the lake. This plant growth and decomposition reduces the amount of oxygen available to fish and other aquatic animals in the lake. The problem is further compounded because the decomposition of large amounts of organic matter further enriches the nutrient levels of the lake. This vegetative decomposition causes a layer of decayed and decaying vegetative muck to accumulate on the lake's bed which reduces the sport fish spawning habitat. The drawdown project was conceived by Tennessee Wildlife to allow the organic muck to dry, compact, reoxygenate, and decompose in an attempt to improve the oxygen level, reduce the nutrient level, and improve the sport fish spawning habitat once the lake is refilled.

In the summer of 1984, Tennessee Wildlife gave public notice of the drawdown proposal and public comment was solicited. The Reelfoot Lake Technical Committee was formed and included experts from various state, federal, and private agencies along with private citizens from the area. Four federal governmental agencies represented on the committee were the United States Fish and Wildlife Service, the U.S. Army Corps of Engineers, the Soil Conservation Service, and the U.S. Geological Survey. Unfortunately, the committee had no decisionmaking authority but served only as an advisory and information-sharing group to the Tennessee Wildlife Resources Agency drawdown project leader.

In December of 1984, Tennessee Wildlife's Executive Director ordered the drawdown project leader to prepare a study of the environmental effects of the draw-down. A full draft was circulated to the Technical Committee in February, 1985, the final study was published in the spring of 1985, and public hearings were then held. The drawdown proposal was considered by Tennessee Wildlife and approved on May 17, 1985.

Tennessee Wildlife personnel began the drawdown on May 24, 1985, by opening small gates in the spillway structure on the land leased to the United States Fish and Wildlife Service. Because the dam had been regularly operated by the United States Fish and Wildlife Service, the Tennessee Wildlife employees borrowed a crank from the Service in order to open the gates. On May 27, 1985, the Tennessee Wildlife personnel opened a single, large radial gate in the spillway using a mechanical device also obtained from the United States Fish and Wildlife Service. Prior to this date, state personnel had not performed the actual physical manipulation of the lake's water level since the lease was signed in 1941. Here both Tennessee Wildlife and United States Fish and Wildlife maintain that the State had the authority under the 1941 lease to operate the spillway.

The United States Fish and Wildlife Service's participation on the technical committee involved the giving of advice which it routinely does across the country in the normal course of its functions as a federal government agency. No federal funds were requested nor utilized in the drawdown project.

On May 24, 1985, the plaintiffs filed this action to enjoin the drawdown and to require that the Department of Interior comply with any applicable National Environmental Policy Act requirements. The National Environmental Policy Act states that all agencies of the federal government must

> include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environ-

ment, a detailed statement by the responsible official on—

> (i) the environmental impact of the proposed action,
>
> (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
>
> (iii) alternatives to the proposed action,
>
> (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
>
> (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2)(C). It is admitted by the State that the drawdown will have significant effects on the human environment of the area, so the question becomes whether it involves a major federal action thus requiring an environmental impact statement. Relying chiefly on the terms of the 1941 lease and the United States Fish and Wildlife Service's history of maintaining the Reelfoot National Wildlife Refuge, the district court granted an injunction against the drawdown until the Service filed an environmental impact statement.

The order appealed from here is styled "Order Granting Preliminary Injunction." Pursuant to Fed.R.Civ.P. 65(a)(2), however, the district court had consolidated the hearing on the application for a preliminary injunction with a trial on the merits. The scope of our consideration under these circumstances, therefore, is the clearly erroneous standard outlined in Fed.R.Civ.P. 52.

■ In concluding that the drawdown is a major federal action, the district court found that the 1941 lease unambiguously gave the United States Fish and Wildlife Service the exclusive authority to manipulate Reelfoot Lake's water level. On appeal, "[t]he interpretation and construction of a written contract are matters of law within the competence of the Court of Appeals to review and do not come under the clearly erroneous rule." *Cordovan Associates, Inc. v. Dayton Rubber Co.*, 290 F.2d

858, 860 (6th Cir.1961). Thus, whether the terms of the lease are ambiguous is a question of law for this Court to determine, *see Tennessee Consolidated Coal Co. v. United Mine Workers*, 416 F.2d 1192, 1198 (6th Cir.1969), *cert. denied*, 397 U.S. 964, 90 S.Ct. 999, 25 L.Ed.2d 256 (1970), and a *de novo* standard of review will apply to the district court's holding concerning the unambiguous nature of the lease. *Potter v. Ranger Ins. Co.*, 732 F.2d 742, 743 (9th Cir.1984).

■ In entering the lease, the State of Tennessee through the Reelfoot Lake Commission had determined that

> development [of] an environment most suitable for migratory birds, other desirable bird species, fur bearing animals and fish and of a refuge or refuges for migratory birds within the areas of the State's property at Reelfoot Lake will be of substantial benefit to the people of the State of Tennessee and of the United States....

It is clear from the lease, paragraph 5, that the Commission and the Service decided that these purposes would best be served by granting the Service the exclusive authority to control the dams and spillways in the leased area on Reelfoot Lake. Although paragraph 4 restricts the extent that the Service may manipulate the water level, the lease unambiguously states that the Service "shall maintain and operate, during the terms of this lease, the dams and spillways." Certainly under these terms of the lease, the State of Tennessee did not expressly reserve any rights to manipulate the lake's water level by means of the dams and spillways.

Congress intended that the Service protect its interests when establishing an "inviolate sanctuary" for migratory birds. The Migratory Bird Conservation Act specifically states that the acquisition of sanctuaries

> by the United States shall in no case be defeated because of rights-of-way, easements, and reservations which from their nature will in the opinion of the Secre-

tary of the Interior in no manner interfere with the use of the areas so encumbered for the purposes of this subchapter, but such rights-of-way, easements, and reservations retained by the grantor or lessor from whom the United States receives title under this subchapter or any other Act for the acquisition by the Secretary of the Interior of areas for wildlife refuges shall be subject to rules and regulations prescribed by the Secretary of the Interior for the occupation, use, operation, protection, and administration of such areas as inviolate sanctuaries for migratory birds or as refuges for wildlife....

16 U.S.C. § 715e. The exclusive authority of the Service to operate the spillway of Reelfoot fits neatly into this defined legislative scheme of preserving sanctuaries such as Reelfoot for migratory birds.

Amplifying our holding that the unambiguous language of the lease controls, the conduct of the parties over the last forty-five years is also of interest. Between August, 1941, and May, 1985, the State did not operate the spillway. The Service itself, moreover, has conducted several minor drawdowns at the request of the State. As noted by the district court, in 1976 the State proposed a twelve-inch drawdown to improve sport fishing. In a letter to the United States Fish and Wildlife Regional Director, the Reelfoot National Wildlife Refuge Manager stated that Tennessee "seeks our cooperation because, by long-term agreement, we control the water level of the lake." A 1978 letter from the Tennessee Wildlife Resources Agency to the Reelfoot National Wildlife Refuge Manager stated:

Tennessee Wildlife Resources Agency would again this year request that the Reelfoot Lake water level be lowered as set forth in the agreement between our agency and the U.S. Fish and Wildlife Service. I will appreciate you referring to this prior agreement and start the drawdown at your convenience. As previously discussed, this drawdown is to be used in fish management techniques. If there is any problem please call us.

The conduct of the parties is indicative of a relationship in which the Service maintained exclusive authority to operate the spillway gates of Reelfoot Lake.

Tennessee Wildlife has argued that the public trust doctrine precludes any interpretation of the 1941 lease that would give the Service exclusive control of the spillways and dams in the leased area. In applying this doctrine to Reelfoot Lake, the Tennessee Supreme Court stated:

Inasmuch, therefore, as the lake has capacity for navigation in the technical sense, as laid down in *Stuart v. Clark*, [32 Tenn. (2 Swan) 1 (1852)] the rights of the public attach to it, to its use, and to its fisheries, so that it is incapable of private ownership, and the state owns it in trust for all the people, and cannot alienate it away.

*State v. West Tennessee Land Co.*, 127 Tenn. 575, 158 S.W. 746, 752 (1913). In *Illinois Central Railroad v. Illinois*, 146 U.S. 387, 453, 13 S.Ct. 110, 118, 36 L.Ed. 1018 (1892), the Supreme Court declared:

The control of the State for the purposes of the trust can never be lost, except as to such parcels as are used in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining.

This public interest exception has been applied by both the Supreme Court and several state courts. *See* Carlson, *The Public Trust and Urban Waterfront Development in Massachusetts: What is a Public Purpose?*, 7 Harv.Envtl.L.Rev. 71, 76 (1983); Coquillette, *Mosses from an Old Manse: Another Look at Some Historic Property Cases About the Environment*, 64 Cornell L.Rev. 761, 812 (1979). Although no Tennessee court to our knowledge has applied this public interest exception, the Tennessee Supreme Court did state that with the exception of how the court defined "navigable waters," " 'the principles of the common law, regulating and defining the respective rights of the public and of the riparian proprietors in

rivers of whatever character, remain unchanged, and are to be applied by the courts.'" *West Tennessee Land Co.*, 158 S.W. at 749 (quoting *Stuart v. Clark*, 32 Tenn. (2 Swan) 1 (1852)).

Here the lease of the lake property by Tennessee to the Service clearly falls within the public interest exception to the public trust doctrine. The 1941 lease expressly states the development of the refuge will be "of substantial benefit to the people of the State of Tennessee and of the United States." We also note that the State protected other interests of its citizens in Reelfoot Lake. The 1941 lease reserved the right to fish on the leased area for the benefit of the citizens of Tennessee, subject to federal regulations consistent with its use as a wildlife refuge. By restricting the Service's ability to manipulate the lake's water level, moreover, the State has protected its interest in the lake as a whole. The lease of property to the Service is in the public interest and does not substantially impair "the public interest in the lands and waters remaining."

■ Tennessee Wildlife argues that the State retained authority to manipulate the lake's water level through an easement by implication. The agency claims that this easement is necessary for the use and enjoyment of the property retained by the State. In Tennessee, "an easement by implication, or implied reservation, should not arise except where it is of such necessity that it must be presumed to have been within the contemplation of the parties." *LaRue v. Greene County Bank*, 179 Tenn. 394, 166 S.W.2d 1044, 1049 (1942). We also note that "such easements are not looked upon with favor and the policy of the law is to restrict the doctrine of implied easement." *Lively v. Noe*, 62 Tenn.App. 218, 460 S.W.2d 852, 854 (1970). As we noted, the State's interest in the remaining property is not substantially impaired by the grant of exclusive authority to the United States Fish and Wildlife Service. Given this fact and the policy against establishing easements by implication, we decline to

hold that such an easement arises in this case.

The State further argues that the rule of practical construction counsels that the interpretation of the lease currently given by Tennessee Wildlife and United States Fish and Wildlife should be determinative in this case. In Tennessee, the rule of practical construction, "long recognized and applied in this jurisdiction, is that the interpretation placed upon a contract by the parties thereto, as shown by their acts, will be adopted by the court and that to this end not only the acts but the declarations of the parties may be considered." *Hamblen County v. City of Morristown*, 656 S.W.2d 331, 335 (Tenn.1983). Although the parties currently maintain that the State has authority to conduct the drawdown, the clear language of the lease and the prior conduct and statements of the parties grant the United States Fish and Wildlife Service exclusive control over the dams and spillways in the leased area.

Given the unambiguous nature of the lease and United States Fish and Wildlife's responsibilities and conduct over the past forty-five years, we affirm the district court's holding that an environmental impact statement is required before this major drawdown may proceed.

In promulgating the National Environmental Policy Act, Congress declared in sweeping language that

> it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

42 U.S.C. § 4331(a). Although the Act is not to be applied to actions taken prior to 1970, as to ongoing projects "the applica-

tion must be made to major federal actions as to projects ... when such actions constitute substantial changes, after January 1, 1970, in decisions theretofore made or in actions theretofore undertaken." *League of Women Voters v. U.S. Corps of Engineers*, 730 F.2d 579, 584 (10th Cir.1984). The phrase "major federal action" is not defined in the Act itself, but the U.S. Council on Environmental Quality has issued regulations that state:

> "Major Federal action" includes actions with effects that may be major and which are potentially subject to Federal control and responsibility. Major reinforces but does not have a meaning independent of significantly....
>
> (a) Actions include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies....

40 C.F.R. § 1508.18 (1984).

In this case, the United States Fish and Wildlife Service has had a continued presence at Reelfoot Lake since 1941 in managing the Reelfoot National Wildlife Refuge. The federal government has expended substantial resources on this project over the years. The Service, moreover, by the terms of the lease has exercised exclusive and uninterrupted control over the spillway.

Tennessee Wildlife would have us consider the drawdown in isolation from this ongoing federal project. Given the clear legislative intent in the National Environmental Policy Act, we reject this view and consider the drawdown to constitute a substantial change in an ongoing federal project that requires an environmental impact statement. The terms of the lease and the conduct of the parties indicate that the Service has exclusive authority to control the spillway and the Act is not to be circumvented by the Service's sudden abdication of its responsibilities under the terms of the lease and the Migratory Bird Conservation Act. By abdicating its responsibilities, the federal government has attempted to transform the drawdown into

state action; such conduct is not to be tolerated under the National Environmental Policy Act.

Tennessee Wildlife also argues that the drawdown is not a major federal action but is simply state action coupled with federal inaction. The State relies on the decisions in *Defenders of Wildlife v. Andrus*, 627 F.2d 1238 (D.C.Cir.1980), and *State of Alaska v. Andrus*, 591 F.2d 537 (9th Cir.1979). In these two related cases, the courts found that the Secretary of Interior's failure to halt a wolf-kill program, conducted by the State of Alaska primarily on federal land, was not action under the National Environmental Policy Act.

The Ninth Circuit, while noting that other circuits have been more strict in the application of the environmental impact statement requirement, relied on past decisions in that circuit to find that no statement need be filed by the Department of Interior. The court held that "the nonexercise of power by an executive-branch officer does not call for compliance with NEPA." 591 F.2d at 538. The District of Columbia Circuit subsequently reached the same result and insisted on an "overt act" by the federal government before requiring that an impact statement be filed. The court quoted an environmental treatise that noted " 'federal license, permits, leases, loans, grants, insurance, contracts, contract extensions and modifications, conveyances, assistance authorizations, approvals of right-of-ways, or filings in appropriate cases may require preparation of an impact statement although the federal presence is minimal.' " 627 F.2d at 1245 (quoting W. Rodgers, Environmental Law 761–62).

The wolf-kill decisions are distinguishable from this case. This case is simply not one of federal inaction. In the wolf-kill situation, the State of Alaska had the responsibility and authority to manage resident game species. *Defenders of Wildlife*, 627 F.2d at 1249–50. Thus, the federal government could do absolutely nothing and the wolf kill could still occur. In this case, however, under the terms of the 1941 lease, the State of Tennessee had no au-

thority to operate the spillway. The United States Fish and Wildlife Service had to turn over the control to the State, in effect modifying the 1941 lease. This abdication of the Service's responsibilities under the terms of the lease and the Migratory Bird Conservation Act cannot be viewed as "inaction." Moreover, such abdication is a substantial change in an ongoing federal project, a point not addressed in the wolf-kill opinions.

The district court's order granting the injunction prohibiting further drawdown of Reelfoot Lake is affirmed.