951 F.2d 669
 34 ERC 1669, 22 Envtl. L. Rep. 20,633
 SABINE RIVER AUTHORITY, Plaintiff-Appellant,
and
Texas Water Conservation Association, Plaintiff-Intervenor-Appellant,
v.
U.S. DEPARTMENT OF INTERIOR et al., Defendants-Appellees.
and
The Sierra Club and the National Audubon Society,
Defendants-Intervenors-Appellees.
 No. 90-4761.
 United States Court of Appeals,
Fifth Circuit.
 Jan. 28, 1992.
Rehearing Denied March 4, 1992.
 
 William H. Burchett, Christine C. Ryan, Jorden Schulte & Burchette, Washington, D.C., Earl Roberts, Jr., Roberts, Hill & Calk, Longview, Tex., for Sabine River Authority.
 Michael J. Booth, Frank R. Booth, Booth & Newsom, Austin, Tex., Ruth H. Yeager, First Asst. U.S. Atty., Tyler, Tex., Lisa Hemmer, Atty., Robert L. Klarquist, Dept. of Justice, Appellate Section, Environmental Natural Resources, Washington, D.C., for Texas Water Conservation Ass'n.
 Jos. Irion Worsham, Worsham, Forsythe, Samples & Wooldridge, Dallas, Tex., for Little Sandy Hunting & Fishing Club.
 Robert G. Dreher, Sierra Club Legal Def. Fund, Washington, D.C., for Sierra Club and Nat. Audubon Society.
 Appeals from the United States District Court for the Eastern District of Texas.
 Before GOLDBERG and GARWOOD, Circuit Judges, and BUCHMEYER,* District Judge:
 GOLDBERG, Circuit Judge:
 
 
 1
 This case is for the birds--thousands of them. And we mean that in no facetious sense.
 
 
 2
 At issue is a non-development easement on 3800 acres of land in East Texas, containing high-quality wetlands and wildlife habitat essential to migratory waterfowl. The Little Sandy Hunting and Fishing Club donated the easement to the U.S. Fish and Wildlife Service in an effort to guarantee that the wetlands would be preserved in their pristine state without the corrupting effect of commercial, agricultural, and industrial development. By accepting the easement, the Fish and Wildlife Service has thus insured that migratory birds and other wildlife can flourish there.
 
 
 3
 The Sabine River Authority and the Texas Water Conservation Association, though not unsympathetic to the plight (and flight) of our fine feathered friends, filed a lawsuit alleging that the Fish and Wildlife Service violated the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321 et seq., by failing to prepare an Environmental Impact Statement (an "EIS") in connection with the acquisition of the easement. When the district court dismissed their claims by way of summary judgment, Sabine River Authority v. United States Dept. of Interior, 745 F.Supp. 388 (E.D.Tex.1990), they appealed. We affirm.
 
 
 4
 The district court correctly dismissed the claims brought by the Sabine River Authority and the Texas Water Conservation Association, and we are hard-pressed to improve upon its scholarly work. Its survey of the relevant case law was extensive, its analysis persuasive. Rather than dilute the strength of the district court's reasoning and pollute the legal environment with an expansive discussion of our own, we write only to express the depth of our commitment to the district court's fluid opinion. We must remediate in one area, however, filtering out the minute particles of contaminant in the district court's "standing" water.
 
 PHASE I
 
 5
 Wetlands, with its swamps, marshes, bogs, mud flats and other water-dependent community types, are an ecological treasure. They play a vital role for wildlife by providing nesting and habitat for many species of fish, birds, plants and other wildlife. For the bird community, wetlands foster high species diversity, density, and productivity by providing both food and habitat, in the form of nesting sites, breeding and rearing areas, feeding grounds, and cover from predators. Office of Technology Assessment, Wetlands: Their Use and Regulation, at 5-6, 30, 52 (1984). Many endangered species rely on our wetlands for their survival and reproductive success. Without the wetlands, we are all but assured of their extinction.
 
 
 6
 Beyond the direct import of wetlands to wildlife, they also serve other equally significant environmental functions. One of the more apparent is their favorable effect on our water quality. By filtering contaminants out of water before they can reach the open water, wetlands serve as nature's own water purifier. By absorbing large amounts of water, wetlands protect us from potential flooding.
 
 
 7
 As with many of our most precious natural resources, our wetlands are threatened by commercial, agricultural, and industrial development. In the last 200 years, thirty to fifty percent of our nation's wetlands have disappeared. Because wetlands are critical to flood control, water supply, water quality, and, of course, wildlife, their rapid disappearance is setting the stage for what may eventually become a significant environmental catastrophe. The State of Texas alone has lost 8 million acres, nearly half of its original wetlands. With only some 7.6 million acres remaining, wetlands presently constitute a mere 4.4 percent of Texas' acreage. As the wetlands continue to shrink, the threat to our environment escalates.
 
 
 8
 Recognizing that our nation's wetlands are vital to the environmental equilibrium, the Fish and Wildlife Service embarked on a laudatory effort to preserve the existing wetlands. The Fish and Wildlife Service is charged with the responsibility of protecting and maintaining the population of migratory waterfowl, other wildlife resources, and endangered species. Toward that end, it established the National Wildlife Refuge System, a project that has earned widespread approval from environmental groups. Through the Refuge System, the Fish and Wildlife Service has acquired millions of acres of environmentally rich lands, lands which are to be preserved in their natural state: no development, no mining, just mother nature's original recipe without any artificial ingredients. These lands provide a winter home to the thousands of migratory birds utilizing the "Central Flyway" and support large populations of Native North American wood ducks. U.S. Fish and Wildlife Service, Wetlands of the United States: Current Status and Recent Trends at 15 (1984).
 
 
 9
 Some of the land is acquired in fee simple; but since the Fish and Wildlife Service merely seeks to prohibit environmentally destructive activity on the land, much of it is obtained in the form of leases and easements which preclude development of the land. This method proves far more economical in effectuating the goal of preventing adulteration to the lands, because the government need not buy the property and take title outright; it can accept a non-development easement--a promise by the owner to refrain from developing the property in a manner inconsistent with wetland preservation--and thereby achieve the goal of protecting the environmental status quo at a fraction of the cost.
 
 
 10
 The Fish and Wildlife Service acquired the Texas wetlands at issue in this case precisely in this manner. Little Sandy Hunting and Fishing Club donated a non-development easement on approximately 3800 acres of its land to the Fish and Wildlife Service so that the character of the wetlands would remain unchanged, undeveloped, in perpetuity. These lands had been targeted by the Fish and Wildlife Service for several years because of its particularly rich natural attributes. Some studies rated the vegetation on Little Sandy's land as "one of the most pristine bottomland areas i[n] the state [of Texas]." The lands consist of "old-growth timber," including willow, oak, hickory, gum, elm, ash, hackberry, palmetto, switchcane, and possum haw understory, and its bottomlands play host to such dwellers as mallards, gadwalls, ringnecks, and wood ducks.
 
 
 11
 The Sabine River Authority and the Texas Water Conservation Association, cognizant that the federal government's acquisition of this land foreclosed the State of Texas from taking the property by means of eminent domain, were less than pleased to learn of the donation. They had given serious consideration to using that land to construct the Waters Bluff Reservoir, a $158 million, forty-five thousand acre project along the Sabine River in Smith, Upshur, and Wood Counties. Their plans for the construction of the reservoir, aimed at satisfying the anticipated need for additional water over the next forty years, were still in the preliminary stages: they had obtained none of the necessary federal and state permits, had secured no funding, and had not yet entered into any firm contracts for the 300 thousand plus acre feet of water that the reservoir would generate each year. Nevertheless, they were dissatisfied with the turn of events and filed suit in the Eastern District of Texas alleging that the Fish and Wildlife Service had failed to comply with the procedural requirements of NEPA by not preparing an Environmental Impact Statement (an "EIS") in connection with its acquisition of the Little Sandy non-development easement. They alleged that the easement was interfering with their long-term plan to take the property by eminent domain, construct the Waters Bluff Reservoir, and thus insure that the state's water supply would not be placed in jeopardy in the calendar year 2030. Invoking NEPA, they asserted that the Fish and Wildlife Service's acquisition of the easement constituted a "major federal action significantly affecting the quality of the human environment," 42 U.S.C. § 4332(2)(C), thereby necessitating the preparation of an EIS.
 
 
 12
 In a comprehensive opinion, 745 F.Supp. 388 (E.D.Tex.1990), the district court dismissed their claims by way of summary judgment. The court reasoned that the Fish and Wildlife Service had prepared an adequate Environmental Assessment (the "EA") and had issued a "Finding of No Significant Impact" ("FONSI") as a precursor to acquiring the easement. Concluding that there was no corresponding change in the physical environment flowing from the acquisition of the non-development easement, the district court held that the Fish and Wildlife Service's decision to forego an EIS was not arbitrary and capricious. Id. at 392-97. It dismissed the lawsuit, and this appeal followed.
 
 PHASE II
 
 13
 A preliminary issue in this case, indeed in every case, is whether the party bringing the lawsuit has standing. After rejecting on the merits plaintiffs' challenge to the Fish and Wildlife Service's decision to forego an EIS, the court below remarked that plaintiffs had no standing to bring this lawsuit in the first place. It reasoned that:
 
 
 14
 The Court's finding that the plaintiffs' claims are not within NEPA's scope and that they are contrary to NEPA's purpose compels the conclusion that the plaintiffs lack standing to assert a claim under NEPA. The plaintiffs' interest in constructing a reservoir is unquestionably an interest that is subject to the provisions of NEPA, but it is not an interest that NEPA was designed to protect.
 
 
 15
 745 F.Supp. at 397. In essence, the district court concluded that because the Fish and Wildlife Service was not obligated under NEPA to prepare an EIS under the circumstances present in this case (a conclusion with which we agree), the injuries alleged by the plaintiffs as a consequence of the absence of an EIS were not within the zone of interests protected by NEPA. With that conclusion we disagree.
 
 
 16
 The standing inquiry has constitutional, statutory, and judicially formulated components. North Shore Gas v. EPA, 930 F.2d 1239, 1242-43 (7th Cir.1991). It has as its origins the constitutional requirement that federal courts only decide cases or controversies. Constitution, Article III, § 2. When we say that a particular plaintiff has no standing to bring the lawsuit in the constitutional sense, we mean that the plaintiff has not suffered an injury which is redressible by the court. Allen v. Wright, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). This inquiry places not too heavy a burden on a prospective plaintiff because even "a probabilistic benefit from winning a suit is enough 'injury in fact' to confer standing" under the Constitution. North Shore Gas, 930 F.2d at 1242.
 
 
 17
 From an Article III perspective, the plaintiffs have standing. "Injury in fact is not confined to economic injury, but may include injuries to aesthetics and well-being." Save Our Wetlands, Inc. v. Sands, 711 F.2d 634, 640 (5th Cir.1983).
 
 
 18
 The procedural injury implicit in agency failure to prepare an EIS--the creation of a risk that serious environmental impacts will be overlooked--is itself a sufficient 'injury in fact' to support standing, provided this injury is alleged by a plaintiff having a sufficient geographical nexus to the site of the challenged project [such that they can] expect [ ] to suffer whatever environmental consequences the project may have.
 
 
 19
 City of Davis v. Coleman, 521 F.2d 661, 671 (9th Cir.1975); accord Friends of the Earth v. U.S. Navy, 841 F.2d 927, 932, modified, 850 F.2d 599 (9th Cir.1988); see also South East Lake View Neighbors v. Dept. of Housing and Urban Development, 685 F.2d 1027, 1039 (7th Cir.1982) (construing City of Davis to hold that the "injury occurred with the creation of a risk that potential environmental damage would go undiscovered"); cf. North Shore Gas, 930 F.2d at 1242 ("a probabilistic benefit from winning a suit is enough 'injury in fact' to confer standing in the undemanding Article III sense"); but see Greenpeace USA v. Stone, 748 F.Supp. 749, 755 (D.Hawaii 1990) (expressing concern over whether a plaintiff with a geographical nexus to project satisfies the injury in fact requirement by virtue of a procedural injury alone), appeal dismissed as moot, 924 F.2d 175 (9th Cir.1991).
 
 
 20
 The Sabine River Authority has been charged by the State of Texas with the weighty responsibility of managing, conserving, and monitoring the waters of the Sabine River in order to meet the "domestic uses of the people in the district, including all necessary water supplies for cities and towns." Water Aux. Laws art. 8280-133, § 14(d). It has alleged an economic injury (shortage of water supply) attendant to the Fish and Wildlife Service's acquisition of the Little Sandy Easement. The Texas Water Conservation Association is an organization incorporated under the laws of the State of Texas which has as its stated mission the conservation of water resources of the state. Its membership includes "river authorities, individuals, firms, corporations, cities, water districts, public and private agencies and groups dedicated to the task of conserving, developing, protecting and utilizing the water resources of Texas for beneficial purposes." This organizational plaintiff has a "sufficient geographical nexus" to the Little Sandy property, and the interests at stake affect the members of the organization such that the organization has standing to bring the claims on their behalf. See Save Our Wetland, Inc., 711 F.2d at 640 (organizational plaintiff had standing because member of organization who fished at site in question was "injured" by adverse aesthetic impact). The injuries that these parties allege relate to the adverse environmental effects that they will experience as a result of the Fish and Wildlife Service's acquisition of the Little Sandy easement. As the district court observed:
 
 
 21
 One effect of the [Fish and Wildlife Service]'s action is that as long as the easement remains in the National Wildlife Refuge System, [the Sabine River Authority] cannot build the Waters Bluff Reservoir. Although federal law provides certain procedures by which land may be released from the Refuge System, there is certainly a risk that [the Sabine River Authority] may not convince either the Congress or the Secretary of the Interior to relinquish the easement.
 
 
 22
 745 F.Supp. at 396 & n. 6. According to the plaintiffs, the Sabine River Authority's inability to condemn this property and build the Waters Bluff Reservoir on that site creates a substantial risk that the region will experience water shortages some forty years in the future. Although there is necessarily some speculation attendant to predictions of this sort, the injuries alleged are not "too speculative to support their standing." South East Lake View Neighbors, 685 F.2d at 1035. While still in the early planning stages, plaintiffs were intent on going forward with the construction of the Waters Bluff Reservoir to pretermit any potential water shortage problems; the Little Sandy Easement has made that effort a virtual nullity. We therefore find "a fairly traceable causal connection between the defendant's allegedly illegal conduct and the plaintiff's purported injuries," id. at 1036, sufficient to confer standing in the constitutional sense.
 
 
 23
 In the context of NEPA, however, the Supreme Court has recently explained that beyond the constitutional standing requirements, "the plaintiff must establish that the injury he complains of (his aggrievement, or the adverse effect upon him ) falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." Lujan v. National Wildlife Federation, --- U.S. ----, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695 (1990) (emphasis in original); see also Greenpeace USA, 748 F.Supp. at 756 (Lujan "appears to heighten the requirements for establishing actual injury for purposes of standing under NEPA."). "[T]he only people who may sue to enforce a law are people who belong to the class that the law was designed to protect." North Shore Gas, 930 F.2d at 1243. In other words, "only intended beneficiaries of a statute can seek relief under it." Id. To illustrate, the Supreme Court posited that court reporters are plainly aggrieved when an agency fails to comply with a statutory provision that requires that all proceedings be transcribed; nevertheless, because the parties to the proceedings, and not the court reporters, are the intended beneficiaries of the statutory provision, the parties and not the court reporters would have standing to challenge the agency's non-compliance with the statute. Lujan, 110 S.Ct. at 3186.
 
 
 24
 We are persuaded that the injuries alleged by the plaintiffs in their complaints--harmful effects on the quality and quantity of East Texas' water supply--"are among the sorts of interests" that NEPA was specifically designed to protect. Lujan, 110 S.Ct. at 3187. These alleged injuries fall squarely within the class of injuries that NEPA safeguards: the circuit courts, to be sure, are flooded with cases which elucidate that water quality and water supply are prototypically matters of great environmental concern. E.g., Olmsted Citizens for a Better Community, 793 F.2d 201, 205 (8th Cir.1986) (a federal action which "poses a threat to the physical resources of the area because of anticipated ... water supply problems" must be preceded by an EIS); Environmental Defense Fund, Inc. v. Andrus, 596 F.2d 848, 851-53 (9th Cir.1979) (holding that an EIS was required "to evaluate the environmental consequences of [the] decision [to divert water to industrial use]"); City of Davis v. Coleman, 521 F.2d 661, 671-72 (9th Cir.1975) (allegations in complaint "that the planned industrial development ... may adversely affect the quality and quantity of the city water supply" established injury in fact within the zone of interests of NEPA). Indeed, NEPA itself articulates that the protection of the water quality and supply is an important concern of the statutory scheme. See 42 U.S.C. §§ 4321, 4331(c); see also Metropolitan Edison Co. v. People Against Nuclear Energy, 460 U.S. 766, 103 S.Ct. 1556, 1560-61, 75 L.Ed.2d 534 (1983) (quoting from statements of two principal sponsors of NEPA which identify water supply and quality as a concern of NEPA). Moreover, these plaintiffs are the proper plaintiffs to raise these claims. Although "the intended beneficiaries of NEPA are individual citizens ... the statute expressly contemplates that state and local governments are to play an important role in the effectuation of national environmental policy." City of Davis, 521 F.2d at 672 (citing 42 U.S.C. §§ 4331(a), 4332(2)(C), 4332(2)(F), 4341(4), 4345(1)).
 
 
 25
 This is not a case brought by a disappointed contractor who alleges that he has been injured because he would have been hired to build the Waters Bluff Reservoir had the Fish and Wildlife Service not accepted the negative easement. Like the court reporter example posited in Lujan, the contractor, though arguably aggrieved as a result of the Fish and Wildlife Service's acceptance of the negative easement, would not have standing under the "zone of interests" test because NEPA was not designed to protect contractors' rights: it was designed to protect the environment. Perhaps the best way to illustrate the point is to put the proverbial cart before the horse. If, contrary to our holding on the merits, NEPA did require the Fish and Wildlife Service to prepare an EIS in connection with the Little Sandy easement, we would still have to consider whether these plaintiffs have standing to challenge the Fish and Wildlife Service's non-compliance. We think it is quite plain that the Sabine River Authority and the Texas Water Conservation Association would (and do) have standing to bring a lawsuit because the alleged harm flowing to these plaintiffs from the defendant's non-compliance with NEPA is of a kind with which NEPA is concerned.
 
 PHASE III
 
 26
 This case arises under the network of NEPA, a statute drafted to ensure that federal agencies "carefully consider detailed information concerning significant environmental impacts," and at the same time "guarantee[ ] that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 109 S.Ct. 1835, 1845, 104 L.Ed.2d 351 (1989); accord North Buckhead Civic Ass'n v. Skinner, 903 F.2d 1533, 1540 (11th Cir.1990). It is a procedural statute that demands that the decision to go forward with a federal project which significantly affects the environment be an environmentally conscious one. The statute does not command the agency to favor an environmentally preferable course of action, only that it make its decision to proceed with the action after taking a "hard look at environmental consequences." Robertson, 109 S.Ct. at 1846 (quoting Kleppe v. Sierra Club, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976)). Indeed, NEPA does not prohibit the undertaking of federal projects patently destructive of the environment; it simply mandates that the agency gather, study, and disseminate information concerning the projects' environmental consequences. "Other statutes may impose substantive environmental obligations on federal agencies, but NEPA merely prohibits uninformed--rather than unwise--agency action." Id.
 
 
 27
 How much information the agency must process is the subject of this litigation. NEPA instructs that federal agencies:
 
 
 28
 include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on--
 
 
 29
 (i) the environmental impact of the proposed action, [and]
 
 
 30
 (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented....
 
 
 31
 42 U.S.C. § 4332(2)(C). Thus, NEPA directs federal agencies to prepare what is commonly known in the industry as an Environmental Impact Statement (an "EIS") when it engages in "major Federal action[ ] significantly affecting the environment."
 
 
 32
 "An environmental impact statement is intended to detail the environmental and economic effects of any proposed federal action so that those not directly involved can understand and give meaningful consideration to and make appropriate comment on the factors involved. It also ensures that the decisionmaker give serious weight to environmental factors in making discretionary choices."
 
 
 33
 State of Louisiana v. Lee, 758 F.2d 1081, 1084 (5th Cir.1985). An EIS is "not required for non major action or a major action which does not have significant impact on the environment." Sierra Club v. Hassell, 636 F.2d 1095, 1097 (5th Cir. Unit B 1981) (emphasis added).
 
 
 34
 To assist federal agencies in resolving whether they must prepare an EIS, the federal Council on Environmental Quality ("CEQ") has issued regulations to which these agencies can turn for guidance. Sierra Club v. Marsh, 769 F.2d 868, 870 (1st Cir.1985). These regulations are entitled to substantial deference, Robertson, 109 S.Ct. at 1848, and "are binding on federal agencies." Fritiofson v. Alexander, 772 F.2d 1225, 1236 (5th Cir.1985).
 
 
 35
 The CEQ regulations permit federal agencies to make a preliminary "Environmental Assessment" ("EA") aimed at determining whether the environmental effects of a proposed action are "significant." 40 C.F.R. §§ 1501.3, 1501.4, 1508.9, 1508.27 (1984). According to these regulations, the EA is a "concise" document that "briefly" discusses the relevant issues and either reaches a conclusion that preparation of an EIS is necessary or concludes with a "Finding of No Significant Impact" (called in environmental jargon, a "FONSI"). Id. §§ 1508.9, 1508.13.
 
 
 36
 Sierra Club v. Marsh, 769 F.2d at 870. Thus, "[t]he purpose of an EA is to 'provide sufficient evidence and analysis for determining whether to prepare an [EIS].' " Fritiofson, 772 F.2d at 1236 (quoting 40 C.F.R. § 1508.9(a)(1)). The EA is "a rough-cut, low-budget environmental impact statement designed to show whether a full-fledged environmental impact statement--which is very costly and time-consuming to prepare and has been the kiss of death to many a federal project--is necessary." Cronin v. U.S. Dept. of Agriculture, 919 F.2d 439, 443 (7th Cir.1990). The EA will come to one of two findings: either that the project requires the preparation of an EIS to detail its environmental impact, or that the project will have no significant impact (a "FONSI") necessitating no further study of the environmental consequences which would ordinarily be explored through an EIS. Fritiofson, 772 F.2d at 1236; Marsh, 769 F.2d at 870.
 
 
 37
 When, as in this case, the agency concludes that the preparation of an EIS is not required based on a FONSI, an aggrieved party may challenge the decision in federal court under the Administrative Procedures Act. 5 U.S.C. § 706(2)(A). Before today, our court instructed that a reviewing court should apply the moderately deferential "reasonableness" standard--rather than the highly deferential "arbitrary and capricious" standard adopted by other circuits--in reviewing an agency's decision to forego an EIS. See Fritiofson, 772 F.2d at 1237. However, in Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) ("Oregon Natural ") the Supreme Court held that an agency's decision not to prepare a supplemental EIS is reviewable under the "arbitrary and capricious" standard. This intervening decision by the Supreme Court warrants the abandonment of the "reasonableness" standard.[1] Even though Oregon Natural involved an agency's decision not to prepare a supplemental EIS as opposed to an agency's decision not to prepare the original EIS, the "legal standard for determining when a supplemental EIS is required is 'essentially the same as the standard for determining the need for an original EIS.' " Fritiofson, 772 F.2d at 1239 n. 8 (citation omitted). Oregon Natural has plainly emasculated our precedent applying the reasonableness standard with respect to the review of an agency's decision to forego a supplemental EIS. See Oregon Natural, 109 S.Ct. at 1861 n. 23 (citing with disapproval our decision in Sierra Club v. Froelhlke, 816 F.2d 205, 210 (5th Cir.1987)). We believe that it has similarly undercut our precedent applying the reasonableness standard with respect to an agency's decision to forego the original EIS. See Lockhart v. Kenops, 927 F.2d 1028, 1032 (8th Cir.) (holding that the intervening decision of Oregon Natural undercut Eight Circuit precedent applying the reasonableness standard with respect review of an agency's decision to forego preparation of an original EIS), cert. denied, --- U.S. ----, 112 S.Ct. 186, 116 L.Ed.2d 148 (1991). The standard of review is limited, therefore, to the "arbitrary and capricious" standard. Id.; see also North Buckhead Civic Ass'n, 903 F.2d at 1538 (adopting "the arbitrary and capricious standard when reviewing agency action in NEPA cases").[2]
 
 
 38
 Under this highly deferential standard of review, a reviewing court has the "least latitude in finding grounds for reversal." North Buckhead Civic Ass'n, 903 F.2d at 1538. It may not substitute its judgment for that of the agency, but must studiously review the record to ensure that the agency has arrived at a reasoned judgment based on a consideration and application of the relevant factors. Id.; Oregon Natural, 109 S.Ct. at 1861. Where conflicting evidence is before the agency, the agency and not the reviewing court has the discretion to accept or reject from the several sources of evidence. The agency may even rely on the opinions of its own experts, so long as the experts are qualified and express a reasonable opinion. The reviewing court may be inclined to raise an eyebrow under such circumstances, but it must show the proper respect for an agency's reasoned conclusion even if the reviewing court finds the opinions of other experts equally or more persuasive. Oregon Natural, 109 S.Ct. at 1861.
 
 
 39
 A reviewing court is to review the administrative records as well as other evidence to determine whether the agenc[y] adequately considered the values set forth in NEPA and the potential environmental effects of the project before reaching a decision on whether an environmental impact statement was necessary. If the agenc[y] engaged in this analysis and reasonably concluded on the basis of [its] findings that an impact statement was not required, [its] determination[ ] will be upheld.
 
 Hassell, 636 F.2d at 1097-98.[3]
 
 40
 When a court like ours is asked to review the decision of a district court which has sat as the reviewing court of first instance, the standard of review that we apply will vary depending on the course of proceedings below. If the district court has conducted an evidentiary hearing, and has drawn factual inferences and made credibility determinations, we must give great deference to the district court's conclusions.
 
 
 41
 A court of appeals review of a district court review of an administrative agency's record is indeed an "awkward legal animal," but when the district court's judgment turns on factual matters, or upon the testimony of witnesses, or even upon lengthy evidentiary proceedings, the court of appeals should hesitate to reverse.
 
 
 42
 North Buckhead Civic Ass'n, 903 F.2d at 1539. Where, as here, the district court has resolved the case by way of summary judgment, our review of the district court's conclusions is plenary. We undertake the same task as the district court: we review the materials submitted to the district court (which will include the agency record) and determine whether the agency's conclusions were arbitrary and capricious. Marsh, 769 F.2d at 872 (1st Cir.1985). Because the district court's review pursuant to a summary judgment motion cannot turn on credibility determinations or conflicting factual inferences, International Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257, 1264 (5th Cir.1991), we are in precisely the same position as the district court and can evaluate the record de novo.
 
 PHASE IV
 
 43
 The Fish and Wildlife Service concluded that by accepting the easement from Little Sandy, it did not undertake a major federal action which significantly affected the environment. It prepared an EA which "adequately considered the environmental consequences of its actions." 745 F.Supp. at 402. The EA came to a finding of no significant impact (FONSI), and accordingly, the Fish and Wildlife Service did not find it necessary to prepare an EIS in connection with the acquisition of the easement. After a painstaking review of the agency record, the district court concluded that there was no clear error in the Fish and Wildlife Service's decision. We agree. As the district court observed:
 
 
 44
 The [Fish and Wildlife Service]'s action in this case does not alter the environmental status quo; it does not cause any change in the physical environment. Indeed the purpose of the acquisition of the easement is to foreclose any change in the physical environment of a particular wetland site. As the Court observed in National Association of Property Owners [v. United States ], NEPA does not require a federal agency to prepare an EIS in order "to leave nature alone." 499 F.Supp. [1223] at 1265 [D.C.Minn.1980) ]. NEPA may require an EIS whenever a reservoir is built, but NEPA does not require preparation of an EIS whenever a reservoir is not built.
 
 
 45
 745 F.Supp. at 394. The district court recognized that the acquisition of the easement by the Fish and Wildlife Service did not effectuate any change to the environment which would otherwise trigger the need to prepare an EIS. "An "EIS is not required ... when the proposed federal action will effect no change in the status quo." Burbank Anti-Noise Group v. Goldschmidt, 623 F.2d 115, 116 (9th Cir.1980), cert. denied, 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981). Simply put, we hold that the acquisition of a negative easement which by its terms prohibits any change in the status quo does not amount to "major Federal action[ ] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); see Burbank Anti-Noise Group, 623 F.2d at 116-17 (no EIS required where FAA provided federal financial assistance in connection with the purchase of an airport); Sierra Club v. Marsh, 692 F.Supp. 1210, 1221 (S.D.Cal.1988) ("It would be inconsistent with NEPA's purpose to allow the city to use NEPA to obstruct the implementation of a settlement which will protect endangered species."). An EIS need not discuss the environmental effects of continuing to use land in the manner which it is presently being used. Upper Snake River v. Hodel, 921 F.2d 232, 235 (9th Cir.1980) (citing Burbank Anti-Noise Group, 623 F.2d at 116); see, e.g., Hassell, 636 F.2d at 1099 (rebuilding bridge destroyed in hurricane did not require preparation of EIS under regulations then in effect); Committee for Auto Responsibility v. Solomon, 603 F.2d 992, 1003 (D.C.Cir.1979) (no EIS required when government leased parking lot to new parking management because no change in the status quo), cert. denied, 445 U.S. 915, 100 S.Ct. 1274, 63 L.Ed.2d 599 (1980).
 
 
 46
 The Supreme Court's decision in Metropolitan Edison Co. v. People Against Nuclear Energy makes clear that the inquiry in NEPA cases is whether the federal action at issue is "proximately related to a change in the physical environment." 103 S.Ct. at 1561 (emphasis added). The acquisition of a negative easement which prohibits development does not result in the requisite "change" to the physical environment. Of course, when the government conveys property to, or exchanges land with, a private party that plans to develop the land, an EIS is necessary because the conveyance of property is precipitating a change in the physical complexion of the land. Lockhart v. Kenops, 927 F.2d at 1033 (citing National Forest Preservation Group v. Butz, 485 F.2d 408, 411-12 (9th Cir.1973)); Bob Marshall Alliance v. Hodel, 852 F.2d 1223, 1227 (9th Cir.1988), cert. denied, 489 U.S. 1066, 109 S.Ct. 1340, 103 L.Ed.2d 810 (1989); Conservation Law Foundation of New England, Inc. v. General Services Administration, 707 F.2d 626, 633 (1st Cir.1983). But by merely accepting title to the property--or, as in this case, accepting a negative easement which precludes any development of the land whatsoever--the government is not undertaking a project that changes the character or function of the land. See Ono v. Harper, 592 F.Supp. 698, 701 (D.Hawaii 1983) (no EIS required where proposed transfer of title would not cause any change in the physical environment). We view the Fish and Wildlife Service's "action" in accepting the negative easement as tantamount to "inaction." See Defenders of Wildlife v. Andrus, 627 F.2d 1238, 1243 (D.C.Cir.1980) (no EIS required when federal government decides not to exercise its authority to prevent the State of Alaska from killing wolves on federal land); State of Alaska v. Andrus, 591 F.2d 537, 541 (9th Cir.1979) (same); cf. Bunch v. Hodel, 793 F.2d 129, 135-36 (6th Cir.1986) (abdication of the Fish and Wildlife Service's obligations under the terms of a lease and the Migratory Bird Conservation Act could not be viewed as "inaction").
 
 
 47
 The agency came to a finding of no significant environmental impact, and we detect no error in that forecast.[4] "The court finds it unlikely that a no impact finding would be held unreasonable where the government seeks to acquire some additional parcels of land for environmental mitigation purposes." Sierra Club v. Marsh, 692 F.Supp. at 1221. The land is earmarked as a wildlife habitat and migratory bird refuge. We agree with the Fish and Wildlife Service and the district court that this intended "use" of the Little Sandy property has no significant environmental impact. On this point, we note that we are not altogether persuaded that the anticipated harm to the East Texas water supply can be precisely linked to the federal action at issue here. Although for purposes of standing we have held that the plaintiffs have established an injury in fact sufficient to bring these claims, an EIS is only necessary where there is "reasonably close causal relationship between a change in the physical environment and the effect at issue." Metropolitan Edison, 103 S.Ct. at 1561. Aside from the absence of any "change" in the physical environment, we entertain serious doubts as to whether the adverse impact on water quality and supply expected in the year 2030 can be attributed to the Fish and Wildlife Service's acquisition of the Little Sandy easement. In our view, plaintiffs seek to stretch the parameters of predictability to their limits. They ask for environmental clairvoyance, though the agency personnel--and we judges--are but mere mortals.
 
 
 48
 We have given the record more than just a birds-eye view, and finding no reason to migrate from the district court's judgment, we take refuge in its nest.
 
 
 49
 AFFIRMED.
 
 
 
 *
 District Judge for the Northern District of Texas, sitting by designation
 
 
 [1]
 The Fritiofson panel rejected an invitation to abandon the reasonableness standard in favor of the "arbitrary and capricious" standard adopted by other circuits, recognizing that it could only do so if an intervening Supreme Court decision mandated as much
 
 
 [2]
 We recognize that the Eighth Circuit has held that Oregon Natural does not control the standard of review in a case where the issue involved is the threshold one of whether NEPA even applies at all. Goos v. I.C.C., 911 F.2d 1283, 1292 (8th Cir.1990). If an agency determines that NEPA does not apply in the first instance, and the agency makes that determination without preparing an EA and without making a finding of no significant impact, the Eighth Circuit applies a reasonableness standard, not Oregon Natural 's arbitrary and capricious standard. Id. We need not concern ourselves with these distinctions even though there is a substantial question presented in this case as to whether NEPA applies at all; the Fish and Wildlife Service decided to forego an EIS "after assuming the applicability of NEPA, after preparing an EA, and after determining that there was no significant [environmental] impact." Goos, 911 F.2d at 1292. Thus, the arbitrary and capricious standard of review applies. Although it is arguably a more lenient standard than the reasonableness test, Fritiofson, 772 F.2d at 1237-38, the differences between the two standards is not "of great pragmatic consequence." Oregon Natural, 109 S.Ct. at 1861 n. 23 ("[O]ur decision today will not require a substantial reworking of NEPA."). And under either standard, we would affirm the judgment below
 
 
 [3]
 Hassell applied the "reasonableness" standard. Nevertheless, we believe that the inquiry under the "arbitrary and capricious standard" is clearly not more rigorous (though also only slightly more deferential) than that articulated in Hassell. See Oregon Natural, 109 S.Ct. at 1861 n. 23 ("[T]he difference between the 'arbitrary and capricious' and 'reasonableness' standards is not of great pragmatic consequence.")
 
 
 [4]
 Ironically, neither does the defendant-intervenor Sierra Club, an environmental group which for the first time, apparently, has advocated against the need for an EIS