**DON'T RUIN OUR PARK,
et al., Plaintiffs,**

v.

**Michael P.W. STONE, et al., Defendants.**

**No. 3: CV–90–1115.**

United States District Court,
M.D. Pennsylvania.

Sept. 9, 1992.

Cristobal Bonifaz, Amherst, Mass., for plaintiffs.

Robert R. Long, Asst. U.S. Atty., Harrisburg, Pa., A. Reid Allison, III, Office of Judge Advocate Gen., Dept. of Army, Arlington, Va., for Federal defendants.

Linda C. Barrett, Deputy Atty. Gen., Office of Atty. Gen., Harrisburg, Pa., for State defendant Major Gen. Gerald T. Sajer.

## MEMORANDUM

McCLURE, District Judge.

## BACKGROUND

This is an action under the National Environmental Policy Act of 1969, as amend-

ed, ("NEPA"), 42 U.S.C. §§ 4321 to 4347,[1] challenging the defendants' decision to allow the Pennsylvania Army National Guard Aviation Support Facility and Company G, 104th Aviation ("104th Aviation")[2] to relocate its training base to the Mid–State Airport ("Mid–State") near Phillipsburg, Pennsylvania. Mid–State is bounded on all sides by Pennsylvania state forest and game commission lands. Located within the state forest is a state park, the Black Moshannon State Park ("Black Moshannon").

The plaintiffs are five conservation associations: Don't Ruin Our Park, the Pennsylvania Federation of Sportsmen's Clubs, the Pennsylvania Environmental Defense Foundation and the Sierra Club (hereafter collectively referred to as "DROP")[3] who take exception to the decision permitting the relocation, claiming that it was based on an inadequate assessment of the potential environmental impact of the operation of the 104th Aviation at that site. Plaintiffs claim that the Environmental Assessment ("EA") performed to justify the move is inadequate and that a more in-depth Environmental Impact Statement ("EIS") is required to explore fully the potential for environmental harm. Named as defendants are the following government officials involved in the decision-making process: Michael P.W. Stone, Secretary of the Army; John B. Conaway, Chief of the National Guard Bureau ("NGB");[4] William A. Navas, Deputy Director of the Army National Guard; and Gerald T. Sajer, Adjutant General of the Pennsylvania National Guard.[5]

The 104th Aviation is a helicopter company with an authorized strength of sixteen CH–47C ("Chinook") helicopters, one UH–1H ("Huey") helicopter and 201 personnel. The unit is supported by an Army Aviation Support Facility ("AASF") which is responsible for aircraft maintenance and for training personnel in aircraft maintenance and helicopter flight procedures. Eleven CH–47C helicopters, one UH–1H helicopter, and 163 personnel are currently assigned to the unit. (Record Document No. 62, Federal Defendants' Statement of Undisputed Facts, para. 5.)

From 1985 to 1990, the 104th Aviation was stationed at the Wilkes–Barre/Scranton International Airport ("WBSI Airport").[6] In 1987, a Site Evaluation Team was formed to search for a new location in eastern Pennsylvania. Timothy Leininger, an "Environmental Specialist" at the Pennsylvania Department of Military Affairs ("DMA"), was appointed to the search team. After considering and eliminating a number of potential sites, for various reasons, the team settled on Mid–State and began efforts to effectuate the relocation. (Record Document No. 62, Federal Defendants' Statement of Undisputed Facts, paras 7 and 8, and AR–3;[7] AR–14 and AR–15.)

1. Jurisdiction exists pursuant to 28 U.S.C. §§ 1331 (Federal Question), 1361 (Action to compel an officer of the United States to perform his duty) and 2201–2202 (declaratory judgments).

2. The Pennsylvania Army National Guard ("PAARNG") is the state militia for the Commonwealth of Pennsylvania and performs civil defense, preparedness, emergency and related state missions and functions. (Record Document No. 62, Federal Defendants' Statement of Undisputed Facts, para. 1.)

3. DROP is the acronym for the lead group, Don't Ruin Our Park.

4. The National Guard Bureau of the Army and Air Force ("NGB"), headquartered in the Pentagon in Washington, D.C., is the federal authority which oversees PAARNG missions and functions. (Record Document No. 62, Federal Defendants' Statement of Undisputed Facts, para. 2.)

5. Major General Sajer is Adjutant General, Pennsylvania; Commander of the Pennsylvania Army National Guard; and the Director of the Pennsylvania Department of Military Affairs ("DMA"). DMA is an executive agency of the Commonwealth of Pennsylvania which provides administrative support to the Pennsylvania Army National Guard ("PAARNG"). (Record Document No. 62, Federal Defendants' Statement of Undisputed Facts, para. 1.)

6. Record Document No. 62, Federal Defendants' Statement of Undisputed Facts, para. 6.

7. Throughout this memorandum, references to the Administrative Record are abbreviated: AR––––.

As the environmental specialist on the team, Leininger participated extensively in preparing the EA for the 104th Aviation's use of Mid–State. Leininger submitted a draft EA (1st DEA) to state, federal and local agencies for comment on June 9, 1988. In it, Leininger concluded that further study was necessary and recommended preparation of an EIS for the proposed move. Leininger concluded by recommending further study of the project's potential impact on wildlife, erosion, sedimentation, and nearby bogs and wetlands. (AR–4, pp. 39–40)

On June 21, 1988, the 1st DEA was withdrawn from consideration by Frank Audino, Director of Facilities, Pennsylvania DMA. Leininger left the employ of the DMA shortly thereafter, and was replaced on the Evaluation Team by LTC Gregory Parrish who had been appointed an acting DMA Environmental Specialist on July 26, 1988.

A second draft ("2nd DEA"), signed by Parrish, was issued a month after withdrawal of the first. The 2nd DEA contained a different set of conclusions than the first. It found that the proposed move to Mid–State would have no significant impact on the environment (referred to as a "finding of no significant impact" or a "FONSI") and concluded that no further study of the potential environmental consequences of the move was warranted.

The 2nd DEA was circulated for comment by the participating agencies. Suggestions and comments received were incorporated in the draft, and on September 23, 1988, the 2nd DEA, as revised, was distributed for public comment. A public hearing on the 2nd DEA was held October 6, 1988 in Philipsburg. The 2nd DEA was further revised to reflect comments received during the public comment period. On December 5, 1988, General Sajer signed the 2nd DEA/FONSI, as revised, and it was then forwarded to the National Guard Bureau ("NGB") for comment and review.

In a Memorandum of Understanding (MOU) dated March 3, 1989,[8] the Pennsylvania Department of Environmental Resources (PaDER) agreed to transfer jurisdiction and control over 40 acres of land adjacent to Mid–State to DMA for use by the 104th Aviation.

After a second round of public comment periods, hearings and further revisions, the final EA/FONSI was approved by Brigadier General Navas of the NGB on December 11, 1989, paving the way for the 104th Aviation's move to Mid–State.

Defendants state that the 104th Aviation began moving equipment and personnel to Mid–State the following month.[9] By March, 1990, the move was substantially completed, and full-scale flight/training operations were in progress. By mid-June, 1990, all personnel and equipment were at Mid–State, and the 104th Aviation's lease at WBSI had been canceled.

Plaintiffs filed this action June 11, 1990, challenging the adequacy of the EA/FONSI. They allege that defendants acted in an arbitrary and capricious manner in deciding that an EIS is not necessary by (1) failing to comply with federal regulations which require preparation of an EIS; (2) violating Pennsylvania statutory law governing the preservation of Black Moshannon State Park, 74 Pa.Cons.Stat.Ann. § 5905; (3) creating a "chaotic" environmental process by issuing "contradictory Environmental Assessments requiring and not requiring" an EIS; (4) ignoring peak noise levels, meteorological effects, alternative technologies for noise evaluation and the special impact of helicopter noise in their evaluation of the noise impact of the facility; (5) ignoring "significant public controversy" associated with the planned move; (6) ignoring "severe cumulative and secondary impacts" of the planned move; and (7) ignoring the impacts of the construction and enlargement of access roads to the facility and related industrial development. (Plaintiffs' complaint, pp. 21–22)

---

8. AR–1, Appendix I.

9. The date of the move is disputed. Plaintiffs contend that personnel and equipment were moved to Mid–State long before the EA/FONSI became final and stationing orders were issued. This is an issue which we need not resolve. See the discussion at pp. 39–40 *infra*.

As redress for these grievances, plaintiffs seek an order: (1) declaring that the relocation of 104th Aviation to Mid–State is a major federal action which will significantly affect the quality of the human environment within the meaning of 42 U.S.C. § 4332, such that an EIS is required; and (2) enjoining defendants from taking any further action in connection with the relocation of 104th Aviation until they have complied with 42 U.S.C. § 4332.[10] Plaintiffs also seek costs and attorneys' fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

Before the court are: (1) a motion to dismiss, or in the alternative, for summary judgment by the federal defendants (Record Document No. 62); (2) a motion for summary judgment by the Commonwealth defendants (Record Document No. 66); and (3) a motion for summary judgment by plaintiffs (Record Document No. 93). We will dispose of the federal defendants' motion on summary judgment grounds. For the reasons discussed below, defendants' motions for summary judgment will be granted, and plaintiffs' motion will be denied.

DISCUSSION

*Mootness*

Defendants argue that this action should be dismissed as moot because the 104th Aviation's move to Mid–State has been completed and flight operations have begun. Although temporary facilities have been constructed, permanent facilities have yet to be built.

■ A federal court's jurisdiction over a case continues only so long as there is present an actual "case or controversy", *S.E.C. v. Medical Committee for Human Rights,* 404 U.S. 403, 407, 92 S.Ct. 577, 579, 30 L.Ed.2d 560 (1972). The case becomes moot if, at some stage of the proceedings, a "live controversy" ceases to exist. *Allard v. DeLorean,* 884 F.2d 464, 466 (9th Cir. 1989). However, so long as there remains the possibility that the plaintiff can obtain

"any effective relief", the case is not moot. *Garcia v. Lawn,* 805 F.2d 1400, 1402 (9th Cir.1986.) The defendants' undertaking of conduct that the action sought to halt or prevent does not necessarily render the case moot. " 'It has long been established that where a defendant with notice in an injunction proceeding completes the acts sought to be enjoined the court may by mandatory injunction restore the status quo.' " *Garcia, supra,* 805 F.2d at 1402, quoting *Porter v. Lee,* 328 U.S. 246, 251, 66 S.Ct. 1096, 1099, 90 L.Ed. 1199 (1946). The "heavy burden" of proving a case is moot is on the defendant. *County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979).

A suit to compel an EIS under NEPA becomes moot if a decision has already been made and carried out and cannot be undone. If the project has been substantially completed or has already had an irreversible impact on the environment an EIS would serve no purpose, and the plaintiff cannot obtain meaningful relief. *Blue Ocean Preservation Society v. Watkins* 754 F.Supp. 1450, 1460 (D.Hawaii 1991) (*"Blue Ocean I "*).

■ Although not formally recognized in the documents filed, the move to Mid–State involves three stages: (1) the relocation of equipment and personnel to Mid–State; (2) the construction of temporary facilities at Mid–State; and (3) the construction of permanent facilities at Mid–State. Phases one and two have been completed. Phase three has not.[11] Stage one is reversible, as is stage two. Defendants argue that the move cannot be reversed with ease and that to do so would cause inconvenience to PAARNG personnel and their families who have relocated to the Phillipsburg area. However, whether the reversal can be accomplished with ease is not the issue. The issue is whether it can be accomplished at all.

---

**10.** Following a hearing held August 22 and September 19, 1990, plaintiffs' request for a preliminary injunction enjoining further work on the conversion of Mid–State was denied.

**11.** There is nothing in the record to indicate that permanent facilities have been constructed or begun during the pendency of this action.

Plaintiffs have not been foreclosed from all meaningful relief by the relocation and construction of temporary facilities. Both steps are reversible. If this court finds defendants' EA/FONSI inadequate, it can direct that defendants prepare an EIS before permanent facilities are constructed. See, e.g., *Columbia Basin Land Protection Assoc. v. Schlesinger*, 643 F.2d 585, 591 n. 1 (9th Cir.1981) (Action contesting the placement of a towers and a power line was not moot since the court could order that the power line be moved). Cf. *Sierra Club v. Penfold*, 857 F.2d 1307, 1318 (9th Cir.1988) (Mining operation was complete, making an action to compel an EIS for the project moot, since "a completed mining project cannot be moved"; nor can the court order that the mines be "unmined".)

*Laches*

Defendants argue that this action is barred by laches because plaintiffs waited six months after issuance of the final EA/FONSI to file this action, by which time the move had been completed and full-scale operations begun.

■ Laches is an equitable defense addressed primarily to the discretion of the court. It requires a showing of both "inexcusable delay and undue prejudice." *Daingerfield Island Protective Society v. Lujan*, 920 F.2d 32, 37 (D.C.Cir.1990), *cert. denied*, — U.S. —, 112 S.Ct. 54, 116 L.Ed.2d 31 (1991). "Laches is a disfavored defense in environmental suits". *Id.* It is "invoked sparingly" in such actions because the plaintiff is not the only potential victim if the environment is harmed. Any application "less grudging" would subvert efforts to avert decisions with the potential for serious environmental harm. *Id.*

■ In an environmental action, whether the defendant has been prejudiced by the delay is determined by how much of the project has been completed, whether the relief which plaintiffs seek is still practicable, among other factors. *Daingerfield Island, supra*, 920 F.2d at 38–39.

■ Defendants have not demonstrated that they were prejudiced by plaintiffs' six month delay in filing this action. The steps taken toward completion of the project are not irreversible. In addition, plaintiffs have stated, without contradiction, that they were not idle during the six months, and diligently sought legal representation during the period from January to June, 1990. Plaintiffs have been involved in the decision-making process from at least the date when the second draft EA was made available for public comment, and it should have come as no surprise to them that plaintiffs were proceeding with legal action. The delay involved is not significant and the action taken by defendants thus far on the project does not demonstrate the type of prejudice which would justify barring plaintiffs' claims on the basis of laches. See, e.g., *Coalition for Canyon Preservation v. Bowers*, 632 F.2d 774, 779–81 (9th Cir.1980) (action was not barred by laches even though "significant resources" had been spent on the project and "environmental changes" had "already occurred").

*Administrative Record*

■ The only evidence considered by the court in ruling on the outstanding motions is the evidence reproduced as the Administrative Record. Although plaintiffs sought to supplement the record with evidence not before the agency, the court determined (Record Document No. 35, filed September 14, 1990), based on the holdings in *Pennsylvania Protect Our Water and Environmental Resources v. Appalachian Regional Commission*, 574 F.Supp. 1203, 1212–15 (M.D.Pa.1982), (Rambo, J.), *aff'd per curiam, sub nom, Borough of Moosic v. Appalachian Regional Commission*, 720 F.2d 659 (3d Cir.1983), ("*Appalachian*") and *Lower Alloways Creek Township v. Public Service Electric*, 687 F.2d 732, 743 (3d Cir.1982), that it could not consider evidence not submitted to the agency.[12]

This conclusion is supported by general principles of judicial review of agency decisions endorsed by the United States Supreme Court. In *Camp v. Pitts*, 411 U.S.

---

12. The memorandum stating that decision is published at 749 F.Supp. 1388 (M.D.Pa.1990).

138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973), a *per curiam* decision reviewing the soundness of a decision by the Comptroller of the Currency, challenged under the APA as "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law", the Court stated: "In applying that standard, the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." The Court echoed that view several years later in an environmental case, *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council,* 435 U.S. 519, 555, 98 S.Ct. 1197, 1217, 55 L.Ed.2d 460 (1978), stating: "[T]he role of a court in reviewing the sufficiency of an agency's consideration of environmental factors is a limited one, limited both by the time at which the decision was made and by the statute mandating review".

For purposes of a review under NEPA, the Administrative Record consists of "all documents and materials directly or indirectly considered by agency decision-makers". *City of Waltham v. United States Postal Service,* 786 F.Supp. 105, 116 (D.Mass.1992).

Defendants filed the documents which they contend comprise the Administrative Record. Plaintiffs were given the opportunity to move to supplement defendants' filing if they found it incomplete. Plaintiffs seek to include, as part of the Administrative Record, documents not filed by defendants. Defendants have not made an issue of plaintiffs' request.[13] We will consider the documents submitted by plaintiffs part of the Administrative Record in ruling on the parties' motions.

*NEPA and NGB regulations*

■ NEPA is essentially a procedural statute which provides a framework for analyzing federal agency projects with the potential for impacting the environment by requiring the agency to consider environmental issues before taking any major action. *Strycker's Bay Neighborhood Council, Inc. v. Karlen, per curiam,* 444 U.S. 223, 225, 100 S.Ct. 497, 498, 62 L.Ed.2d 433 (1980) and *Vermont Yankee, supra,* 435 U.S. at 558, 98 S.Ct. at 1219. It seeks to ensure that federal agencies contemplating such action receive in-put from various sources to assist them in rendering a fully-informed decision so that significant environmental effects are not overlooked or underestimated only to be discovered after resources have been committed to the project or the decision otherwise made irreversible. *Robertson v. Methow Valley Citizens,* 490 U.S. 332, 349, 109 S.Ct. 1835, 1845, 104 L.Ed.2d 351 (1989) and *Kleppe v. Sierra Club,* 427 U.S. 390, 409, 96 S.Ct. 2718, 2729, 49 L.Ed.2d 576 (1976).

Although the procedures prescribed by NEPA

> are almost certain to affect the agency's substantive decision ... NEPA itself does not mandate particular results, but simply prescribes the necessary process.... (Citations omitted).... If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs.... Other statutes may impose substantive environmental obligations on federal agencies ... NEPA merely prohibits uninformed—rather than unwise—agency action.

*Robertson, supra,* 490 U.S. at 350–51, 109 S.Ct. at 1845–1846 (Footnote omitted.).

NEPA is implemented by regulations adopted by the Council on Environmental Quality ("CEQ"), which are set forth at 40

---

**13.** The federal defendants did file a response to "plaintiffs' suggested additions to the administrative record" (Record Document No. 82). In their response, defendants questioned the completeness and authentication of the documents plaintiffs suggested for inclusion in the administrative record, as some documents plaintiffs submitted were unsigned. However, defendants raised no substantive objections to inclu-

sion of any of the documents plaintiffs proposed.

The administrative record before this court will, therefore, consist of all documents submitted by defendants as comprising the record, as well as the documents plaintiffs suggested for inclusion. (See: Record Document Nos. 82, 83 and 87)

C.F.R. §§ 1500 to 1508 (1991). CEQ regulations define "significant impact" to include considerations of:

(a) Context.... [T]he significance of an action must be analyzed in several contexts such as society as a whole ... the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole....

(b) Intensity. This refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity:

....

(3) Unique characteristics of the geographic area such as proximity to ... park lands ...

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

....

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

....

(10) Whether the action threatens a violation of Federal, State, or local law

or requirements imposed for the protection of the environment.

40 C.F.R. § 1508.27.

Decisions by the NGB on projects are governed by its own Army regulations as well, set forth at 32 C.F.R. §§ 651.1 to 651.46 and 33 C.F.R. §§ 2301.1 to 230.26. NGB regulations require an EIS to be prepared if a project involves military construction (which is defined to include off-post construction) or have the potential to "significantly affect environmental quality" or "result in potentially significant and uncertain environmental effects." (See: AR–33, paras. 5–3(b) 5–3(h) and 32 C.F.R. §§ 651.29 and 651.30.)

*Environmental Assessment*

NEPA requires that all federal agencies contemplating "major federal action" which will "significantly" affect the quality of the human environment prepare a detailed statement, an EIS, which analyzes the environmental impact of the proposed action, describes adverse environmental effects which cannot be eliminated and lists alternatives to the proposed action. 42 U.S.C. § 4332(2)(C). If the action proposed is not one which "normally" requires an EIS under NEPA regulations, 40 C.F.R. § 1501.4(a)(1) (1991), the agency prepares an EA to determine whether further study, in the form of a more-in-depth, and more costly EIS, is necessary. *Sabine River Authority v. United States Department of the Interior*, 951 F.2d 669, 676–77 (5th Cir.1992), *petition for cert. filed*, 60 U.S.L.W. 3843 (U.S. June 2, 1992) (No. 91–1929) and 40 C.F.R. § 1508.9(a)(1) (1991).

■ An EA need not discuss the merits and drawbacks of the proposal in exhaustive detail. By nature, it is intended to be an overview of environmental concerns, *not* an exhaustive study of all environmental issues which the project raises.[14] If it

---

**14.** Section 1508.9 defines an EA as a:
... concise public document for which a Federal agency is responsible that serves to:
(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an ... [EIS] or a finding of no significant impact.
(2) Aid an agency's compliance with the Act [NEPA] when no ... [EIS] is necessary.

(3) Facilitate preparation of a statement when one is necessary.
[and which]
(b) Shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

were, there would be no distinction between it and an EIS. Because it is a preliminary study done to determine whether more in-depth study analysis is required, an EA is necessarily based on "incomplete and uncertain information." *Blue Ocean Preservation Society v. Watkins*, 767 F.Supp. 1518, 1526 (D.Hawaii 1991) (*"Blue Ocean II"*). So long as an EA contains a " 'reasonably thorough discussion of ... significant aspects of the probable environmental consequences' ", NEPA requirements have been satisfied. *Sierra Club v. United States Department of Transportation*, 664 F.Supp. 1324, 1338 (N.D.Ca.1987) (*"Sierra Club, Calif."*) quoting *Trout Unlimited v. Morton*, 509 F.2d 1276, 1283 (9th Cir.1974).

If, after analysis and preparation of an EA, the agency concludes that the proposed project will not have a significant impact on the environment, and that no further study of the issues is necessary, the agency issues a finding of no significant impact or a "FONSI",[15] and does not prepare an EIS. 42 U.S.C. § 4332(2)(C) and 40 C.F.R. §§ 1501.4(e); 1508.9 and 1508.13 (1991). If, on the other hand, the conclusion is that the proposal will significantly affect the environment, an EIS must be prepared before the project goes forward. 42 U.S.C. § 4332(2)(C) (1982).

■■■ If the agency's decision not to prepare an EIS is challenged, the question before the reviewing court is whether the plaintiffs have established a "substantial possibility" that the agency's decision not to prepare an EIS is inconsistent with its obligations under NEPA. The court "must essentially look to see if the agency decision, in the context of the record, is too 'unreasonable' (given its statutory and factual context) for the law to permit it to stand." *Waltham, supra,* 786 F.Supp. at 114–15, citing *Sierra Club v. Marsh,* 769 F.2d 868, 870 (1st Cir.1985).

*Judicial standard of review*

■■■ Judicial review of federal agency decisions is governed by the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706: Under section 706 of the APA, the court can reverse an agency decision not to prepare an EIS, only if it finds the agency decision "arbitrary and capricious". *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 375–76, 109 S.Ct. 1851, 1860, 104 L.Ed.2d 377 (1989) (EIS case) and 5 U.S.C. § 706(2)(A).[16]

> ... [I]n making the factual inquiry concerning whether an agency decision was 'arbitrary or capricious,' the reviewing court 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' This inquiry must 'be searching and careful,' but 'the ultimate standard of review is a narrow one.' ... When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive. On the other hand ... courts should not automatically defer to the agency's express reliance on an interest in finality without carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision based on its evaluation of the significance—or

---

**15.** CEQ regulations define a FONSI as:
> a document by a Federal agency briefly presenting the reasons why an action, not otherwise excluded (§ 1508.4), will not have a significant effect on the human environment and for which an ... [EIS] therefore will not be prepared. It shall include the ... [EA] or a summary of it and shall note any other environmental documents related to it ...

40 C.F.R. § 1508.13.

**16.** Section 706(2) provides, in relevant part:
> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
> ....
> (2) hold unlawful and set aside agency action, findings and conclusions found to be—
> (A) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.

5 U.S.C. § 706.

lack of significance of the ... information. A contrary approach would not simply render judicial review generally meaningless, but would be contrary to the demand that courts ensure that agency decisions are founded on a reasoned evaluation 'of the relevant factors.'

*Marsh, supra,* 490 U.S. at 378, 109 S.Ct. at 1861.

Under this "highly deferential standard of review", *Sabine, supra,* 951 F.2d at 678, the court's role does not extend beyond ensuring that the agency has adequately considered and disclosed the environmental impact of its actions and "arrived at a reasoned judgment based on a consideration and application of the relevant factors." *Id.* The court may not "substitute its judgment for that of the agency." *Id.* Accord: *Kleppe, supra,* 427 U.S. at 410 n. 21, 96 S.Ct. at 2730 n. 21 and *Strycker's Bay Neighborhood Council, Inc. v. Karlen, per curiam,* 444 U.S. 223, 227, 100 S.Ct. 497, 499, 62 L.Ed.2d 433 (1980).

Where conflicting evidence is before the agency, the agency and not the reviewing court has the discretion to accept or reject from the several sources of evidence. The agency may even rely on the opinions of its own experts, so long as the experts are qualified and express a reasonable opinion. The reviewing court any be included to raise an eyebrow under such circumstances, but it must show the proper respect for an agency's reasoned conclusion even if the reviewing court finds the opinions of other experts equally or more persuasive.

*Sabine, supra,* 951 F.2d at 678.

The District of Columbia Circuit has listed four factors to be considered in reviewing an agency decision not to prepare an EIS:

1. whether the agency identified the relevant areas of environmental concern;

2. whether the agency took a 'hard look' at the problem in preparing the EA;

3. with respect to the problems identified and studied whether the agency made a convincing case for its determination that the impact was insignificant; and

4. if there was any impact of true significance, whether the agency convincingly established that changes or safeguards in the project sufficiently reduced the impact to a minimum.

*Sierra Club v. United States Department of Transportation,* 753 F.2d 120, 127 (D.C.Cir.1985) ("*Sierra Club, D.C.*"). Accord: *Coalition on Sensible Transportation, Inc. v. Dole,* 826 F.2d 60, 66–67 (D.C.Cir.1987) ("*Coalition v. Dole*").

These factors are not applied blindly, but in a manner which recognizes that federal agencies have considerable latitude under NEPA to make choices, even if the choice made may impact the environment.

The NEPA process involves an almost endless series of judgment calls.... It is of course always possible to explore a subject more deeply and to discuss it more thoroughly. The line-drawing decisions necessitated by this fact of life are vested in the agencies, not the courts. The latters' 'role ... is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary and capricious.'

*Coalition v. Dole, supra,* 826 F.2d at 66, quoting *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 97–98, 103 S.Ct. 2246, 2252, 76 L.Ed.2d 437 (1983).

*Motion for summary judgment standard*

This case is before the court on summary judgment motions. Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that *there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*" Fed.R.Civ.P. 56(c) (Emphasis supplied).

... [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who

fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

The moving party bears the initial responsibility of stating the basis for its motions and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. He or she can discharge that burden by "showing … that there is an absence of evidence to support the nonmoving party's case." *Celotex, supra* at 323 and 325, 106 S.Ct. at 2552 and 2553.

Issues of fact are genuine "only if a reasonable jury, considering the evidence presented, could find for the non-moving party." *Childers v. Joseph*, 842 F.2d 689, 694 (3d Cir.1988), citing *Anderson v. Liber-*

ty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Material facts are those which will affect the outcome of the trial under governing law. *Anderson, supra*, 477 U.S. at 248, 106 S.Ct. at 2510. In determining whether an issue of material fact exists, the court must consider all evidence in the light most favorable to the non-moving party. *White v. Westinghouse Electric Company*, 862 F.2d 56, 59 (3d Cir.1988).[17]

"In a NEPA case, the Court should grant summary judgment for the defendant agency unless the Court's review of the record reveals that the plaintiff has discovered therein a genuine issue of material fact as to whether the agency's decision was arbitrary and capricious or otherwise an abuse of discretion." *Waltham, supra*, 786 F.Supp. at 115.

*Alleged inadequacies in the EA/FONSI filed by defendants*

Plaintiffs allege that the EA/FONSI prepared by defendants fails to address adequately: (1) the noise impact flight operations will have on park visitors; (2) the "significant public controversy" associated with the project; (3) the "severe cumulative and secondary impacts" the project will cause; and (4) the impact that construction and expansion of access roads to Mid–State and other industrial development will have on the park.[18] (Plaintiffs' complaint, pp. 21–22)

17. Prior to commencement of the hearing on plaintiffs' motion for a preliminary injunction and following a discussion among counsel in chambers, it was decided that plaintiffs' request for a preliminary injunction would be consolidated with their request for relief on the merits, and that testimony introduced at the hearing which followed would be considered for both purposes.

18. Plaintiffs' argument focuses principally on these four alleged deficiencies/improprieties. Although they mention other alleged inadequacies stemming from defendants' alleged failure to examine more thoroughly the impact which relocation of the 104th Aviation will have on soil, ground-water, vegetation, and wildlife in areas adjacent to Mid–State, they do not identify precisely what the alleged inadequacies are. (See: Record Document No. 94, pp. 21–25). As support for their contention that further study of these areas is required, plaintiffs rely principally on the conclusions stated in the Leininger

draft (See: AR–2, pp. 39–41), an issue which we discuss elsewhere in this memorandum. (See pp. 35–38 *infra*.)

Plaintiffs rely also on the comments of an outside expert, Richard T. Wardrop. Wardrop, a certified professional geologist, criticizes the data defendants relied on in characterizing the hydrogeology of the Mid–State area as too general. Wardrop opines:

The EA attempts to characterize the hydrogeology of the … [Mid–State] area using previously published work. The discussion concerning geology and groundwater are not focused on the area surrounding … [Mid–State] but are adopted from generalized discussions of the Appalachian Plateau Physiographic Province, Rush Township, or the Philipsburg quadrangle. Here the characterization is incomplete and much of the description does not apply or is inaccurate. An accurate characterization of the site hydrogeology could be accomplished using other, easily ac-

Plaintiffs also challenge the adequacy of the process by which the final EA/FONSI was adopted, alleging that the circulation and subsequent withdrawal of an initial draft inconsistent with final findings infused chaos and confusion into the decision-making process. The inconsistencies and the rapidity with which new findings were issued, plaintiffs allege, bring into question whether the findings were made in good faith or represent nothing more than a post hoc rationalization for a decision already made.

*Noise impact*

■ Plaintiffs disagree with both defendants' methodology and with their conclusion that noise from the facility will not have a significant impact on the park. Defendants concluded in the final EA that flight operations will increase noise levels in the park by an average of 5 to 16 dBA [19] and that increases in that range will not have a significant impact on residents, the adjoining state park, state forest, or wildlife. AR–1 at pp. 21–22.

Defendants arrived at these conclusions after performing noise studies in accordance with Army regulations. Army regulations allow noise studies to be conducted by computer noise simulation (NOISE-MAPS) or actual noise monitoring. (See: AR–19, 37 and 59) Defendants used both.

A NOISEMAP simulation was performed first to predict noise contours as they would be heard on the ground. The results are displayed in the EA in map form. The noise contours predicted by the NOISE-MAP are divided into three zones: Zone I—acceptable noise levels; Zone II—normally acceptable levels; and Zone III—unacceptable. (AR–1, Figure 4.3–1, p. 19a) No part of the state park or adjacent areas fall within Zones II (65 to 75 dBA) or III (over 75 dBA). All of the state park falls within Zone I, meaning that, under Army regulations,[20] the noise impact for those areas will be below "significant" annoyance levels for noise sensitive areas. (See: AR–1, pp. 18–22 and AR–51, Vol. 2, pp. 5–24) This by itself would have been sufficient to justify a finding of no significant impact,[21] but defendants went further.

Defendants then did an actual noise study to meet the requirements of the MOU with PaDER and PaDMA. (AR–69). Actual noise levels were consistent with the NOISEMAP projections. The monitoring results indicated that: (1) actual flight operations did not result in noise levels in excess of those agreed upon in the MOU; (2) wind direction had no measurable effect on the noise analysis; and (3) the noise levels measured were well within projected and acceptable levels. (AR–69).

Based on these findings, as well as data indicating that "past aviation operations" conducted at Mid–State, and helicopter operations conducted over extended periods of time in "comparable environments" did not adversely impact wildlife, (AR–1, pp. 21–22), defendants returned a finding of no significant impact.

cessed and interpreted, previous work and installing water level monitoring points and doing the field testing mentioned above. Even close examination of the ... [Mid–State] field area on the Black Moshannon USGS [United States Geological Survey] 7.5 minute topographic quadrangle sheet would have revealed how short potential groundwater flow paths are to the surrounding headwaters and wetlands. In summary, the EA has not adequately characterized the hydrogeology of the ... [Mid–State] area.

(Record Document No. 94, pp. 24–25, quoting AR–62). As is discussed at pp. 1252–1253 *infra,* agencies are not required to adopt the opinions of outside experts, and scientific unanimity is not a prerequisite to a FONSI.

Defendants' analysis of the points which plaintiffs challenge, as discussed in the final EA, is adequate under NEPA requirements. (See: AR–1, pp. 25–47).

**19.** dB is the scientific symbol for decibel, a unit for measuring the loudness of sound. dBA refers to the decibels above reference noise, adjusted. *Random House Dictionary of the English Language,* 510 (2d ed. 1987).

**20.** The Army regulations in effect when the EA/FONSI was signed are reproduced at AR–33. New regulations were adopted January 23, 1990 and are reproduced at AR–32. Defendants' determinations are governed by the prior regulations.

**21.** Army noise regulations do not require actual monitoring. AR–32, Ch. 7, paras. 7–5(c)(1)–(3). See also: Army Regulation–200–1 (June 15, 1982), paras. 7–8.

Plaintiffs argue that defendants' analysis "completely ignored timely comments from plaintiffs' experts about the deleterious effects of helicopter noise on the park atmosphere." Citing comments from noise and meteorology expert Dr. Dennis Thomson, noise expert Dr. David C. Swanson, and from parks expert Dr. Maurice Goddard, (AR–62), plaintiffs ·contend that defendants failed to take into account the effects noise from the 104th Aviation's operation will have on the park. (Record Document No. 94, p. 15)

Defendants did not fail to take the considerations cited by plaintiffs' experts into account; they simply disagreed with them. Defendants did consider the effects which the noise from flight operations will have on the park.

 Plaintiffs' arguments accomplish nothing more than establishing that scientific authorities differ on the wisdom of relocating the 104th Aviation to Mid-State and the effects the relocation may have on the ambience of the park. That alone is insufficient to prove defendants' findings and conclusions arbitrary and capricious. NEPA does not require "scientific unanimity regarding the wisdom or environmental effects of a proposed project" to justify a FONSI. Disagreement among experts does not invalidate a FONSI. *Sierra Club, Calif., supra,* 664 F.Supp. at 1338 (EIS case). Accord: *Sierra Club, D.C., supra,* 753 F.2d at 129.

The data and analysis defendants relied upon in reaching a finding that noise from Mid–State will not "significantly affect" the park provide a sufficient basis for an "informed conclusion", and that is all that the law requires. *Sierra Club, Calif., supra,* 664 F.Supp. at 1338 (EIS case).

The nature of the harm which plaintiffs fear flight operations will cause further weakens their argument. Plaintiffs' principal concern is not that the noise will disturb or harm wildlife, but that it will detract from park visitors' enjoyment of the park. They assert that helicopter noise will be a discordant note in an otherwise relaxing nature setting. This argument ignores the character of the park as it existed prior to the relocation of the 104th Aviation to Mid–State. The park was not a pristine wilderness setting, but a recreational area. Swimming, fishing, picnicking, boating and pleasure driving are all permitted within park boundaries (AR–1, p. 18). "Of the 304,278 visitors to the park in 1987, 143,015 were pleasure drivers visiting the park." (AR–1, p. 18)[22] Against the background of all of that activity, defendants were certainly justified in concluding that the added impact of a projected 1,100 annual daytime helicopter fly-overs and 440 nighttime fly-overs would be minimal. (AR–21, p. 21) See generally: *Conservation Law Found. v. United States Air Force,* Civil No. 87–1871, slip op. (D.Mass. Nov. 23, 1987) (WESTLAW 1987 WL 46370) (Allowing construction of Air Force defense towers to go forward without an EIS not an arbitrary and capricious decision since the only impacts were adverse aesthetic effects and a danger to bald eagles).

Plaintiffs argue that defendants' conclusion is inconsistent with guidelines promulgated by the Committee on Hearing, Bioacoustics and Biomedics of the National Academy of Science ("CHABA Guidelines") to assist federal and state agencies in deciding whether to prepare an EIS. (AR–98) Plaintiffs point out that the guidelines require what the Committee terms a full noise environmental documentation ("NED") and an EIS, if noise exceeds the levels defendants' own data indicates will exist at Mid–State during flight operations. (AR–98, pp. II–2 and III–2)

 Defendants had no obligation to comply with CHABA Guidelines. They were included in the Administrative Record only at plaintiffs' insistence. Defendants did not include them in filing the Administrative Record and chose not to oppose plaintiffs' request that the guidelines be considered part of the record before this court.

22. Snow-mobiling, wood-cutting and hunting are permitted in the adjacent state forest and state gamelands. (AR–1, p. 19)

By their own terms, CHABA Guidelines are superseded by Army regulations. The CHABA Guidelines were promulgated to assist federal agencies in "achieving nationwide consistency in dealing with noise problems" and to "lead to objective and uniform evaluation and disposition of the noise impacts." The guidelines provide that they do not apply to a federal agency if they conflict with the guidelines of that agency, in which case, the agency guidelines are controlling. (AR–89, Introduction at p. I–1.)

The Army has its own regulations governing noise assessment procedures, making CHABA Guidelines inapplicable. As discussed above, noise assessment was ·done in compliance with Army regulations.

■ Plaintiffs also challenge a contingency clause in the Memorandum of Understanding (MOU)[23] in which defendants agree that if noise levels exceed certain thresholds, the matter will be submitted to the Pennsylvania Office of General Counsel for resolution. Plaintiffs argue that this provision is a mitigation measure under NEPA,[24] and interpret NEPA as requiring mitigation measures only if an EIS is required. They, therefore, contend that defendants' inclusion of mitigation contingencies is inconsistent with their FONSI, and should be considered a concession by defendants that the project may have a significant environmental impact.

We do not view the contingency clause in that light. The clause is part of the MOU negotiated between PaDER and DMA. Mitigation measures are not required by NEPA under Army regulations, because, as discussed above, projected and actual noise levels for the areas affected by flight operations are below "significant" annoyance levels for noise sensitive areas. (See: AR–51, Vol. 2, pp. 5–24). Therefore, the regulations do not require defendants to agree to undertake any mitigation mea-

sures. The fact that DMA has chosen to do so as part of its agreement with PaDER for transfer of the land does not implicate otherwise.

Contrary to plaintiffs' argument, DMA has done nothing inconsistent with NEPA in entering into a negotiated agreement to monitor noise levels, respond to complaints about noise levels, and submit disputes which may arise on this point to the Pennsylvania Office of General Counsel for resolution. NEPA contemplates the utilization of mitigation measures to " 'sufficiently reduce the impact to a minimum' " so that an EIS will not be required. *Waltham, supra,* 786 F.Supp. at 126 n. 20 and *Coalition v. Dole, supra,* 826 F.2d at 67.

·Plaintiffs' argument that the "mitigation measures" spelled out are insufficient because they do not specify what action will be taken if threshold noise levels are exceeded fails for the same reason. Projected noise levels are below acceptable levels specified by Army regulations, exempting defendants from the *obligation* to take any mitigation measures to bring noise levels within acceptable limits. The voluntary undertaking of continued monitoring and promised attempts to mitigate does not invalidate defendants' conclusion that noise will not have a significant impact, nor does it impose a duty to prepare an EIS or undertake mandatory mitigation steps. Cf. *United States v. 27.09 Acres of Land,* 760 F.Supp. 345, 351–52 (1991).

*Alleged inconsistency with state law*

Plaintiffs contend that the relocation violates state statutory law because it contravenes the legislative mandate that the environmental integrity of park lands be preserved. Pennsylvania law provides that:

... no future use of Mid–State Airport shall impair in any way the integrity of the adjacent State forest and State park lands and their ecosystems.

**23.** The MOU is incorporated into the EA (AR–1, Appendix–I).

**24.** CEQ regulations define "mitigation" to include steps taken to: (1) avoid the impact by not

taking a certain action or parts of an action; (2) minimize the impact by limiting the degree or magnitude of the project; or (3) reduce or eliminate the impact over time by preservation and maintenance operations. 40 C.F.R. § 1508.20.

74 Pa.Cons.Stat.Ann. § 5905.[25]

Plaintiffs' argument on this issue is based solely on the contention that noise levels will detract from the park setting and interfere with park visitors' commune with nature, warranting a finding that the project's impact will be significant. We have already dismissed that argument as unfounded. Defendants justifiably concluded that the noise impact generated by the activities of the 104th Aviation will have only minimal impact on park visitors, and there is no basis for a conclusion to the contrary.

*Cumulative impact*

Plaintiffs contend that the EA/FONSI fails to consider the potential adverse impacts of all other projects planned by state and local governments at and around Mid–State. NEPA requires federal agencies to consider the cumulative impact of "reasonably foreseeable future actions" in assessing the probable environmental impact of the project contemplated. Section 1508.6 of the NEPA regulations defines "cumulative impact" as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency ... or person undertakes such other actions...." 40 C.F.R. § 1508.6. "Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment". See also 40 C.F.R. § 1508.-27(b)(7).

Plaintiffs argue that defendants did not comply with these requirements by failing to take into account all contemplated development described in a draft of the Comprehensive Plan for Rush Township (AR–89). They contend that defendants failed to consider: (1) a 1987 map of suggested transportation improvements depicting possible construction of roads linking U.S. Route 322 and Mid–State and Interstate 80 and Pennsylvania Route 504, both of which would traverse state forest lands (AR–89, p. 248); (2) projects listed as priorities with the Township—the contemplated construction of an "access road from Route 322 to Mid-State (Project 9)" (AR–89, p. 248)—and construction of "a link between Interstate 80 and Mid–State (Project 10)" (AR–89, p. 249); (3) comments on the relocation of Route 220 stating: "Rush Township should monitor this project closely as it may offer the best opportunity for linking Mid–State Airport to State College. This linkage would improve the long-term viability of Mid–State, both as an airport and as an industrial site." (AR–89, p. 250); (4) comments about the airport stating: "Mid–State Airport is a valuable asset to Rush township and the Moshannon Valley. It has the potential to serve as the basis for significant job creation in the Valley. That potential has not been realized with the Airport under State ownership. The development of Mid–State Airport has been limited, in part, because of significant environmental considerations. The airport is located at the headwaters of Six Mile Run and Black Moshannon Creek. These are both high quality streams. Any industrial development proposed for Mid–State *must not* impair the quality of those water resources." (AR–89, pp. 251–52); and (5) policy recommendations which state the following goals: "Continue to work with other municipalities to negotiate with the State for sufficient land around Mid–State airport to allow for future industrial development sufficient to support the cost of operating the Airport.... Encourage the construction of improved access to the Airport and its facilities.... Include an airport district in any zoning ordinance ..." (AR–89, p. 253).

■ The concerns expressed in the plan about the importance of preserving the environment surrounding Mid–State fall into the category of outside comments/observations. The same principle applies to these

---

**25.** This excerpt is part of a the statutory provision which transfers ownership of Mid–State Airport to the Pennsylvania Department of General Services, reserving in PaDER ownership of "the facilities currently owned used and operated at Mid–State Airport" by PaDER "for wild fire attack operations and full access thereto by land and by air". The lead-in to the sentence quoted in the text provides: "Because this involves a transfer of State forest and State park lands ..."

observations as applied to the opinions proffered by plaintiffs' experts. The reviewing agency is not required to accept the opinions and observations of outside experts/commentators over those of its own professionals. It is merely required to take a "hard look" at the issues and is entitled to resolve competing considerations by siding with its experts and commentators. *Sierra Club, Calif., supra,* 664 F.Supp. at 1338 (EIS case) and *Sierra Club, D.C., supra,* 753 F.2d at 129.

Plaintiffs' remaining concerns about the alleged omissions focus on three contemplated projects which defendants allegedly failed to consider: the construction of access roads to and from Mid–State and Interstate 80 and roads linking U.S. Route 322 and Mid–State, and Interstate 80 and Pennsylvania Route 504. Plaintiffs contend that defendants make "only a vague reference to these foreseeable developments and to the Draft Rush Township Comprehensive Plan" in the EA and contend that this fails to satisfy the requirements of NEPA, 40 C.F.R. § 1508.27 and renders the EA "arbitrary, capricious and an abuse of discretion." Defendants note these issues in a brief comment, observing that it "is the goal of Rush Township to develop the airport as a viable service center and industrial park." (AR–1, p. 33)

█ While it is true that defendants could have expanded their comments on this topic, the question is not whether they exhaustively explored the potential ramifications of future development and Mid–State in combination with the 104th Aviation's use of Mid–State, but whether they considered the potential impact at all and took a "hard look" at the issues raised. The consideration which they gave projected expansion plans was adequate given the nature of the contemplated development. Plans involving possible construction of additional access roads to the airport and links between existing roads, while not to be ignored, do not constitute the sort of major development, such as contemplated expansion of the airport facilities to accommodate greater traffic air traffic, etc., which would require extensive additional study by the agencies. Cf. *United States v. 27.09 Acres of Land, supra,* 760 F.Supp. at 351 (Agency's inquiry criticized for failing to include any "consideration of possible future development" of the facilities or of other nearby land in the face of evidence of "substantial ... near-certain future development ... [which would] in fact be felt in combination with the effects of the facility's construction and operation".)

### Release of 1st DEA

Plaintiffs argue that the EA/FONSI is invalidated by the process by which it became final. Citing the issuance and subsequent withdrawal of a first draft containing conclusions inconsistent with the final outcome, they contend that this rendered the entire process chaotic and irretrievably undermined the reliability of the final result. Plaintiffs argue that the agency's rapid about-face on the issues raises serious questions about the seriousness of the review it conducted and suggests that it may not have made a good-faith effort to fully and fairly evaluate the options. They suggest that the decision to move the 104th Aviation to Mid–State was made before the issues were analyzed. See: *Coalition for Canyon Preservation v. Bowers, supra,* 632 F.2d at 782 (the adequacy of an EIS is measured by a test of objective good faith).

█ Disagreement among agency personnel on methodology and conclusions is not a reason for invalidating findings which are otherwise sound. In *Sierra Club, Calif., supra;* 664 F.Supp. at 1336–37 (EIS case), the court rejected the same premise plaintiffs argue here. Plaintiffs in that case argued that statements by three former CalTrans employees that CalTrans management had "deliberately changed the conclusions of its own staff regarding the environmental impacts of the proposed bypass in order to avoid the necessity of preparing" an additional statement on the project. The court rejected the contention that the apparent about-face by CalTrans management evidenced a lack of good faith and undermined the conclusions of the EIS, stating:

Based upon these declarations alone, the court cannot conclude that the record indicates bias or bad faith in the preparation of the EIS. *It is to be expected that technical reports included in an EIS will go through several drafts and numerous revisions before they are finally made public. The role of a court in evaluating the adequacy of technical reports is not to quibble with each definitional or semantic change between drafts, but rather to ensure that the final EIS provides sufficient detail to educate the public and the decision-makers.* The defendants here have offered neutral and good faith reasons for rejecting the conclusions and methodology of the three former CalTrans employees who have alleged irregularities in the preparation of the EIS. These explanations are sufficient to rebut the plaintiffs' claims of bad faith and bias.

*Sierra Club, Calif., supra,* 664 F.Supp. at 1337 (EIS case) (emphasis added).

■ Similar considerations compel the same conclusion in this case. While the rapidity with which a second DEA containing a different set of conclusions was issued lends the appearance plaintiffs suggest, several factors rebut the conclusions plaintiffs seek to draw from the agency's apparent shift in position. The 1st DEA was prepared by an employee of PaDER, Timothy Leininger, and was the initial document in a lengthy decision-making process in which several state and federal agencies participated. It was a starting point, nothing more. From all appearances, Leininger prepared the actual document by himself, or working with only his immediate staff, and PaDER immediately disavowed his conclusions and his methods as soon as the document was completed and circulated for review by others. At or about that time, Parrish replaced Leininger and re-analyzed the issues. This, coupled with the fact that we find the conclusions and findings of the final EA otherwise sound, dispel the implication that no serious analysis was performed and that the outcome was decided

before the analysis was begun. Agencies are entitled to re-think and revise initial impressions, and are not bound by the opinions of staffers, particularly those formed early in the review process before analysis is anywhere close to completion.

■ Plaintiffs argue, along the same lines, that the procedure by which the final EA was adopted was flawed because the early EA drafts were prepared by PaDER and other state staffers with, apparently, little or no involvement by NGB and because Major General Sajer issued a FONSI on December 5, 1988 (AR–51). We are not convinced that this was a procedural irregularity, as it appears to us to have been an interim step in the process by which the EA/FONSI was ultimately approved by NGB when signed by General Navas a year later. However, rather than enmesh ourselves in the procedural requirements surrounding the processing of an EA, we will assume that plaintiffs are correct. That being the case, the result is, nevertheless, not invalidated. Procedural irregularities in the manner an EA/FONSI is adopted do not invalidate findings and conclusions otherwise defensible. See: *Waltham, supra,* 786 F.Supp. at 140.

With respect to plaintiffs' contention that internal dissension within the reviewing agencies [26] invalidates the process and the conclusions reached, we draw the opposite conclusion. (See: Record Document No. 94, pp. 31–36) Internal dissent does not invalidate the process or nullify the result. Healthy debate of the issues illustrates that the NEPA process functioned as Congress intended and that the issues were given full and fair consideration, and that the agencies involved took a "hard look" at the issues, seriously debated the pros and cons, and arrived, ultimately, at a thoroughly-reasoned decision.

As for the related contention that the PAARNG acted prematurely in moving personnel and equipment to Mid–State and beginning operations before the EA/FON-

---

**26.** See: AR–71: (1) Memo from P. Strider dated March 1, 1989; (2) Memorandum from Allan E. Curlee, Major, U.S.A.F., dated February 24, 1989; (3) Position Paper by P. Strider dated February 16, 1989 and (4) Information Paper by P. Strider dated April 4, 1989.

SI became final upon authority of General Navas in January, 1990, there are disputed issues of fact. Plaintiffs contend that actual operations were begun long before the EA became final, and that as early as March, 1989, 104th Aviation personnel and equipment were moved to Mid–State and training operations had begun. They cite, as proof of their contention, a directive dated April 7, 1989 from NGB directing that helicopters moved to Mid–State from Avoca without NEPA compliance be returned.[27] Plaintiffs contend that the PAARNG ignored the directive and never moved personnel or equipment back to Avoca. (See: Record Document No. 94, pp. 34–35).

Defendants dispute these contentions. They contend that there was no "move" to Mid–State prior to execution of the January, 1990 stationing order by General Navas. (See: Record Document No. 100, pp. 9–10) Although their position is inconsistent with the April 7, 1989 NGB directive, we need not, and cannot, resolve the factual discrepancy.

■ In any event, the dispute is not material to our ruling on the parties' motions and does not preclude summary judgment. Whether the 104th Aviation moved prematurely, prior to completion of the NEPA process, and ignored an NGB directive to move personnel and equipment back to Avoca are not issues before this court. Plaintiffs filed this action seeking to compel preparation of an EIS. They do not allege a cause of action for or seek redress for the allegedly preemptive move. (See: plaintiffs' complaint, filed June 11, 1990, pp. 9–25) Whether defendants acted prematurely and/or in violation of NGB relocation orders is, therefore, not an issue before us. In addition, as discussed previously,[28] alleged procedural irregularities in the manner an EA/FONSI is adopted do not invalidate findings and conclusions otherwise defensible. See: *Waltham, supra,* 786 F.Supp. at 127.

*Public opposition*

■ Plaintiffs argue that the level of public opposition associated with the project mandates further study. We disagree. Although the wisdom of the move has been debated publicly since it became public, that alone does not mandate an EIS. If it did, no project opposed by conservation groups could go forward without an EIS.

Controversy is not "necessarily ... equated with opposition." *North Carolina v. F.A.A.,* 957 F.2d 1125, 1133 (4th Cir. 1992). If it were, public outcry and emotion, "not the reasoned analysis" in an EA would determine whether the government is required to go through the costly and time-consuming procedure of preparing an EIS for every project. "The outcome would be determined by a 'heckler's veto.'" *North Carolina v. F.A.A., supra,* 957 F.2d at 1133–34.

Further, the "controversy" to which the regulations refer[29] is equated with scientific debate or a "substantial dispute" over the "size, nature or [environmental] effect" of the action contemplated, not the existence of public opposition, as plaintiffs' argument infers. *Rucker v. Willis,* 484 F.2d 158, 162 (4th Cir.1973). To rule otherwise would place the decision in the hands of opponents of a federal action and require preparation of an EIS for every federal action opposed by vocal, well-organized critics, despite the absence of other criteria warranting further environmental study under NEPA. *Id.* Accord: *Town of Orangetown v. Gorsuch,* 718 F.2d 29, 39 (2d Cir.1983) ("Opposition and a high degree of controversy ... are not synonymous.") and *Coalition on Sensible Transportation, Inc. v. Dole,* 642 F.Supp. 573, 587 (D.C. 1986).

---

**27.** See: AR–71: (1) Position Paper by P. Strider dated February 16, 1989 and (2) Information Paper by P. Strider dated April 4, 1989.

**28.** See: p. 1256 *supra.*

**29.** The "controversy" factor is injected into EA analysis by CEQ regulations set forth at 40 C.F.R. § 1508.27(b)(4), which define "significantly" to include considerations of:

The degree to which the effects on the quality of the human environment are likely to be highly controversial.

There is, here, no evidence that the 104th Aviation's use of Mid–State is the subject of scientific debate or a "substantial dispute" over the "size, nature or [environmental] effect" of that use, and hence, no evidence of the type of controversy to which NEPA regulations refer.

*Summary*

Defendants have done all that NEPA requires. In concluding that an EIS was not warranted, they: (1) identified relevant areas of environmental concern; (2) took a "hard look" at the issues; (3) made a convincing determination that the project will not have a significant impact on the environment; and (4) took reasonable steps to reduce any *potential* impact to a minimum. *Sierra Club v. U.S. DOT, supra,* 753 F.2d at 127 and *Coalition v. Dole, supra,* 826 F.2d at 66–67. Defendants gave full consideration to all relevant issues and made a reasoned determination that no further study was warranted, having had before them sufficient data on which to base an informed decision. Nothing more was required of them under NEPA. See generally: *North Carolina v. F.A.A., supra,* 957 F.2d at 1133 and *Waltham, supra,* 786 F.Supp. at 124, 126–27. See also: *Sierra Club v. U.S. DOT, supra,* 753 F.2d at 129 and *Sierra Club v. Marsh,* 769 F.2d 868, 876–77 (1st Cir.1985).

We will, consistent with that conclusion, enter an order granting defendants' motions for summary judgment and deny plaintiffs' cross-motion.

*Plaintiffs' request for costs and counsel fees*

Summary judgment will be entered in defendants' favor, rendering plaintiffs' request for costs and attorneys' fees under 28 U.S.C. § 2412 [30] moot.

---

**30.** Section 2412(a) provides in relevant part:
 Except as otherwise specifically provided by statute, a judgment for costs, as enumerated in section 1920 of this title, but not including the fees and expenses of attorneys, may be awarded to the prevailing party in any civil action brought by or against the United States or any agency or any official of the United States acting in his or her official capacity in any court having jurisdiction of such action.